### COUNTY OF LAMOILLE,

##### April Term, 1848.

[Continued from Vol. 20, page 603.]

---

PRESENT,

Hon. ISAAC F. REDFIELD,
Hon. MILO L. BENNETT, } Assistant Judges.
Hon. CHARLES DAVIS,

---

### SPALDING v. PRESTON.

The officers of government have authority, derived from the general rights of the government, without any statute whatever upon the subject, to exercise all necessary force for the prevention of crime, either by the arrest of individuals, or by the seizure and detention of the instruments for committing crime; and this authority is also extended, in many instances, to private persons.

Courts of justice will not sustain actions in regard to contracts, which have for their object the violation of law, nor for property intended or designed to be used for such purpose.

Where a large number of pieces of German silver, of the precise size and thickness of Mexican dollars, and made in that form for the purpose of being stamped and milled into counterfeit coin of that description, were taken by the sheriff from a person who was carrying them at the time to a place of manu-

2

facture for the purpose of having them finished, so that he could put them in circulation as genuine coin, and were detained, under the direction of the prosecuting officer, to be used as evidence against the person from whom they were taken, and also for the purpose of preventing their circulation, it was held, that the owner of them, in the absence of evidence that they were put in that form without his knowledge, or against his consent, could not sustain trover against the sheriff therefor.

THE facts in this case sufficiently appear by the opinion of the court, which was delivered by

REDFIELD, J.   This is an action of trover, against the sheriff of Caledonia county, for eleven hundred pieces of German silver, of the precise size and thickness of Mexican dollars, and made in that form for the purpose of being *stamped* and *milled* into *counterfeit coin* of that description.   The defendant took them within his own county, from one Russell, who is shown by the case to have been carrying them, at the time, to a place of manufacture, for the purpose of having them *finished*, so that he could put them in *circulation*, as genuine coin.   They were originally *taken* from Russell, and are still *detained*, under the authority of the state's attorney of Caledonia county.   Russell has been indicted, by the grand jury of that county, and the indictment is still ·pending there.   These pieces of partly finished counterfeit coin are detained for the double purpose of being used, as evidence, upon the trial of Russell, and also of preventing their being put in circulation.

These are the important facts contained in the plea in bar, which was held bad, upon demurrer. . We might say more upon this *form* of presenting the defence, if that point were material to the decision, or had been much insisted upon in the argument of the case.   But as substantially the same facts were admitted upon the trial of the general issue, and are confessedly the important facts in the case, we should feel bound to open the case, for the purpose of having them properly presented, where the party had mistaken his right to present them in the form of a plea in bar.   We understand the law of pleading, under the old rules in England, to be, that such a defence, as the one here presented, is bad, in form, as amounting to the general issue.   1 Chit. Pl. 491.

But as it seems to have been expected we should determine the case upon its merits, we proceed to state the additional fact, which

was proved upon the trial of the general issue, that these pieces of counterfeit coin were, at the time of the seizure by the defendant, the property of one Foster, so far as property can exist in such a thing, and that Foster has, since the seizure, transferred *his rights therein* to the present plaintiff. It is not stated in the case, whether Foster or the present plaintiff were in fact conusant of the crime of Russell, *or how, or why*, they should have a claim to this "stuff," and not be *participes* with Russell. That is left to the *natural* and *legal* intendments, we suppose; upon the ground, doubtless, that it is useless to encumber a case with proof, where no intendment will be likely to prejudice the case, beyond its just deserts. The plaintiff, then, coming in under Foster, stands simply in his place. And as Foster claims property in a thing, in so " questionable a shape," without accounting for the *unfortunate guise* in which his claim is presented, we can only suppose, that no proof in his power would make the case more favorable for him. He must be content, then, for the present, to be esteemed a *particeps* with Russell. If he in fact owned this metal, before it was cast in this mould, and can satisfactorily show, that it was put in its present form without his knowledge, or against his consent, it may avail him hereafter. But no such thing is pretended, even in argument; and what constitutes the extreme impudence and indeed insult of the claim is, that it does not seem to be supposed, that such an inquiry is pertinent to be put to the plaintiff. The court below, the plaintiff seems to suppose, have so viewed the subject, in rendering a judgment for him, wherein they estimated for him the *value* of *his property*, upon some standard, either of its *cost*, or its *utility for honest* or *fraudulent purposes*, and which, we know not. But as the sum recovered was less than $50, we suppose the plaintiff recovered nothing for the *improved condition*, in which he, or his agent, had put the metal.

We have examined the subject with great care, and have come to the following conclusions. The great inquiry in the case undoubtedly is, can this action of *trover*, under the circumstances of this case, be maintained in the courts of this state, for the recovery of the *value* of *this property* ? If so, then *trespass* will lie for the *original taking*. For if that were *lawful*, then also is the *detention*, for the same reason, being for the same object. If, too, the original taking were *unlawful*, and a *wrong*, which the *courts of this state*

Spalding *v.* Preston.

*will redress,* Russell himself might, it would seem, immediately upon the taking, have brought *replevin* and regained the possession of his counterfeit coin, and thus have *wished* and *obtained* the aid of the *courts* of the state to *relieve* him from *irreparable loss,* by a too long delay in offering his goods, while the market was brisk. This is always, we believe, a good ground for instituting replevin, to prevent loss in the depreciation of property during a pending litigation, although it may not be a necessary ground, in order to sustain the suit. Such seems to be a necessary result of the principles contended for, and which seem to be necessarily involved in maintaining this action, unless some distinction can be fairly made out between the plaintiff's rights and those of Russell. And although the proposition may sound somewhat absurd and ludicrous even, it will not be considered, we think, an unfair deduction from the principles necessarily involved in the case. And one, who asks *so much* as this plaintiff does, *should* not shrink, and would not *be expected* to shrink, from the *necessary consequences* of what he asks, *at the hands of justice.* But, for many reasons, we cannot accede to the *justness,* or *legality,* of this claim.

At a very early period in the history of the criminal law of this state it was, by statute, made the duty of sheriffs and other officers to seize counterfeit coin, counterfeit bills, and all tools, by means of which counterfeit money of any description was about to be or might be made. In the Revised Statutes of 1839 the provision in regard to counterfeit coin is omitted, the others all being retained. That this was a mere oversight is sufficiently apparent from the utter absurdity of any supposed distinction between the necessity, or propriety, of seizing the " stamps, dies, plates, blocks, and presses," &c., which are named in the statute, or " bank bills," which are also named, and seizing coin, which is not named. It is obviously nothing done by the legislature *ex industria.* No one will pretend, that the maxim, *expressio unius exclusio alterius,* can have any possible application here. It is a mere oversight.

But as the matter stands, the defendant's authority must rest merely upon general grounds of *preventive justice,* aside of any statute whatever upon the subject. All governments, upon the most obvious principles of necessity, exercise more or less of preventive force, in regard to all subjects coming under their cognizance and

control. This is in analogy to the conduct of individuals, and, indeed, of all animal existence. Many of the instincts of animals exhibit their most astonishing developments in fleeing from the elements, from disease, and from death, at its most distant sound, long before the minutest symptom appears to rational natures. This is the great secret of personal enterprise and success. So, too, in the history of civil governments *prevention* is more *important*, and far more *available*, than *cure*. All sanitary cordons and preventive regulations, every thing in regard to the police of our cities and large towns, indeed prohibitions of lotteries, gambling houses, brothels and disorderly taverns, whether done by general statutes, or mere police regulations, all come under the right of *preventing* more serious injuries by *stifling* the *fountains* of evil. *Obsta principiis* is as just a maxim here as any where. And in doing all this, it must of course somewhat interfere with the natural rights of individuals. One infected with contagion is instantly removed beyond the reach of contact. A ship, or cargo, coming from an infected port, is subjected to long delay and great expense, to prevent the possibility of spreading pestilence. This may in some instances endanger the lives and health of the individuals concerned, and must always, more or less, affect property and abridge personal liberty. And it is often done without any special law of the state, and may always be so done,—as in the case of cholera suddenly breaking out in some remote inland town. And what would be thought of an action of assault and battery, brought against a health officer, who removed the plaintiff from a town, or village, to prevent contagion ; or against the peace officer, who laid his hand upon one, under an honest belief that he was insane, or when he was in fact so, and rushing through the street with a lighted torch to burn some public edifice, or commit some other irreparable injury ? or, if you please, against the sheriff of the county, who, by the direction of the prosecuting attorney for the state, detains counterfeit coin, or those partly finished ?

We find no such actions in the books ; and the want of precedent shows the general sense upon the subject, when it is notorious, that the public officers in our cities subject persons suspected of crime, and every species of engine, or material, with which it is even suspected they intend to operate, to just such restrictions as they deem

proper, and this without regard to any special provisions of statutory enactments. The same is true, also, of those suspected of infection. And in regard to unwholesome provisions, if found to be so in a dangerous degree, there is no doubt they might even be destroyed. So, too, of books and prints, and of all other devices to corrupt the public morals, property cannot exist in them. They are regarded as public nuisances, and any one may destroy them. So, too, certain trades are considered common nuisances in places of great public resort, or concourse,—like smelting of certain metals, slaughtering animals, &c., which would be likely to endanger the public health. And gambling houses and brothels have been regarded as common nuisances in the cities, and might justly be so regarded wherever they exist, perhaps. Society, in all these cases and many others, has. the right to *anticipate*, in order that it may prevent, the injury, which is thus threatened. If it were not so, men, in a social state, would be far more powerless, for purposes of defence, than in a natural state. All will admit the right to restrain a mad man, or a mad animal, from committing injury. And is the rational man, or the senseless material, which threatens crime or irreparable injury, less subject to control, than the maniac, or his torch? And if the incendiary could hardly be expected to have an action of trespass, or trover, for *his* dark lantern, or the bank-robber for *his* saws, and files, and false keys, can the counterfeiter, or his accomplice, any more maintain an action for his base coin, whether in a finished or unfinished state?

The right of private persons *to make arrests*, on their own mere motion, without any *special statute*, and without express warrant, was distinctly recognized in the discussion of a late case in the common pleas, in Westminster Hall,—*Elliot* v. *Allen*, 1 M. G. & Scott, 18, [50 E. C. L. 38, 1845,]—long since the transaction occurred, out of which the present action grew. And this right, in every subject of the realm, is there recognized, for the mere purpose of *preventing crime*. And if the right of personal liberty, which is always reckoned among the most sacred of civil rights, may be thus violated by private persons, upon their own mere motion, much more, it would seem, may such rights of property, as one may be supposed to have, either in counterfeit coin, or in the materials in an unfinished state, be disregarded by a public officer.

The following is the law as laid down in 6 Bac. Ab., Tit. *Trespass* D, p. 579, upon that subject. A private person may, without express warrant, arrest persons who are actually fighting, and keep them in custody, until their passion is over. Has that state of safety yet occurred, in regard to this coin? If surrendered, it would seem there should be some security, that it should not be applied to the same use. Certainly not in this state! So it is said by Bacon, one may arrest one coming to assist another in a fight; Ib.; 1 Hawk. Pl. Cr., C. 3, § 11. So may one arrest another, who is on the point of committing murder, or treason. So he may justify breaking and entering one's house and imprisoning him, "to prevent his committing murder on his wife." *Handcock* v. *Baker*, 2 B. & P. 260. "A private person may, without an express warrant, confine a person disordered in his mind, who seems disposed to do mischief to himself, or any other person." Bro. Ab., Tit. False Imprisonment, *pl.* 25, 28. So he may arrest a night-walker; Ib. *Wheale's Case*, from the year books, 22 Edw. 4, fo. 45, *pl.* 10, is to the same effect in substance. Will it then be said the sheriff is liable to this action?

We shall only mention two other grounds, upon which we think it impossible to maintain this action.

1. It was necessary to *detain* this base metal, as matter of evidence, against Russell. A mere description, either of the form or quality of the pieces, would be much less satisfactory, than the inspection, by the jury and witnesses upon the stand.

2. Courts of justice will not sustain actions in regard to contracts, or property, which have for their object the violation of law. If a gang of counterfeiters had quarrelled about the division of their stock, or tools, a court of justice could hardly be expected to sit, as a divider among them. If one had taken the whole, in violation of the laws by which such associations subsist, a court of law could not interfere, because it is not presumed to be expert in such questions. And if it were, it is considered a public scandal, that such matters should be there discussed, or adjusted. Such property is, so to speak, *outlawed,* and is common plunder. One who sets himself deliberately at work to contravene the fundamental laws of civil governments, that is, the security of life, liberty, or property, forfeits his own right to protection, in those respects, wherein he was study-

ing to infringe the rights of others.   The man who attempts the life or the liberty of another, forfeits, for the time, all right to the protection of his own life, or person; and the person assailed may justly destroy both, if necessary, in his own defence, or if he may be fairly supposed to have esteemed it necessary, under the circumstances.

So, too, if any member of the body politic, instead of putting his property to honest uses, convert it into an engine to injure the life, liberty, health, morals, peace, or property of others, he thereby forfeits all right to the protection of his *bona fide* interest in such property, before it was put to that use.   And he can, I apprehend, sustain no action against any one, who withholds or destroys his property, with the *bona fide* intention of preventing injury to himself or others.

A distinguished English judge, Lord ELLENBOROUGH, I think, once said, in the trial of an action in the king's bench, in regard to an illegal contract, that he would not condescend to sit, as an arbitrator, in regard to the division of spoil among highwaymen.   What he would have said, had one of the gang presumed to bring *trover* against the sheriff of London, for an unreasonable detention of the booty during the pendency of an indictment against an accomplice, it is difficult to conceive.   If such a plaintiff *got out of court* without *getting into Newgate*, with his accomplices, he might esteem himself fortunate.   This is doubtless the first action of the kind, to be found upon the records of any court; but we are aware, that for that reason alone it by no means follows, that it will be the last. We live, we know, in an age of improvements and discoveries. " New customs, be they never so ridiculous, nay, be they unmanly, yet are followed."   It is by no means certain, that this kind of action may not hereafter be ranked among the bold innovations and masterly advancements of the age.   My Lord HOLT said, that he was a bold man, who first ventured to use the general counts in assumpsit, notwithstanding that had then become the general mode of declaring in that action.   And the courts have been constantly extending and facilitating remedies for every wrong; so that we would not have the plaintiff despair of even this remedy soon being firmly established in precedent and practice.   But at present *its novelty is so glaring*, that *we dare* not venture to adopt it.

Judgment reversed and case remanded.