J. E. GREER *et al.* v. JOHN N. PAYNE *et al.*

No. 428.

1. TRUSTS AND MONOPOLIES—*Against Public Policy.* All combinations and associations of persons formed in this state for the purpose of imposing an unreasonable restraint upon the exercise of a trade or business are unlawful and void, as against public policy, and contrary to the statutes of the state.

2. ———— *Rights of Members—Equity.* A court of equity will not lend its aid to a member of such unlawful association to enable him to retain his membership therein, and to restrain the association from suspending or expelling him therefrom for a violation of its illegal rules and by-laws.

MEMORANDUM.—Error from Wyandotte district court; HENRY L. ALDEN, judge. Action by J. E. Greer and Frank O. Mills, partners as Greer, Mills & Co., against John N. Payne and others for an injunction. Judgment for defendants. Plaintiffs bring the case to this court. Affirmed. The opinion herein, filed September 9, 1896, states the material facts.

*Mills, Smith & Hobbs,* for plaintiffs in error; *A. H. Horton,* of counsel; *A. L. Flaningham,* and *L. B. Hilles,* of the Chicago bar, associate counsel.

*McGrew, Watson & Watson,* and *Hutchings & Keplinger,* for defendants in error.

The opinion of the court was delivered by

GARVER, J.: The plaintiffs in error, Greer, Mills & Co., who were plaintiffs below, together with the defendants in error, compose a voluntary association, formed at Kansas City, Kan., and designated as the Kansas City Live Stock Exchange. The plaintiffs were charged, tried by the board of directors, and found guilty of violating the rules of the exchange with reference to the commission charges to be made

for the purchase of cattle. As penalties therefor, fines were assessed against them aggregating the sum of $1,000. By the rules of the association, a member failing to pay a fine assessed against him within three days may be suspended from membership until the same is paid. This action was brought by the plaintiffs, for an injunction to restain the defendants from enforcing the payment of said fines by suspending them from membership in said association. Upon the trial in the district court of Wyandotte county, an injunction was refused, and the case is now here for review upon the pleadings, the findings of fact and conclusions of law, and the judgment. The evidence is not included in the record. Among the findings of the court are the following :

"2. The Kansas City Live Stock Exchange is an unincorporated voluntary association, composed of individuals, partnerships and corporations doing business as live-stock commission merchants at the Kansas City stock-yards, and was organized for the purpose, as expressed in its articles of association, of 'maintaining a business exchange, not for pecuniary profit or gain, nor for the transaction of business, but to promote and protect all interests connected with the buying and selling of live stock at the Kansas City stock-yards, and to promulgate and enforce amongst the members correct and high moral principles in the transaction of business.'

"3. Said exchange issues certificates of membership, has adopted a seal, and permits its certificates of membership to be assigned and transferred. Its membership numbers at this time about 300, and includes nearly all the persons, firms and corporations doing business as live-stock commission merchants at the Kansas City stock-yards. It has no part in the profit of the business of buying and selling live stock, and the sale or purchase of such live stock is not the transaction of the exchange, but is the individual .

transaction of each member, firm or corporation making the particular purchase or sale.    It is maintained by membership fees, dockage fees, and assessments on its members when needed."

"4.  The membership fee in said exchange at this time, as fixed by the exchange, is $1,000, and each member of a partnership, or stockholder in a corporation, is required to take out certificates of membership, to entitle such partnership or corporation to the privileges of such exchange, provided that the total number of such members of a commission firm or stockholders in a corporation holding membership need not exceed five.    Such certificate of membership entitles the holder to all the privileges of the exchange, and to do business with each and all the other members of the exchange, and to the use and service of the dockage system and dockers provided by said exchange in said yards, and such membership, rights and privileges are valuable in and about the business of live-stock commission merchants at said yards, and if the plaintiffs are suspended or expelled from membership in said exchange the same would result in a pecuniary loss to them of more than $2,000.

"5.  To carry out the objects and purposes of its organization said exchange has adopted rules, by-laws and regulations for the government of the exchange and discipline of its members and for the conduct of business by its members at said yards, which, together with its articles of association, are printed in book or pamphlet form, and distributed among all the members of said exchange, and upon becoming a member of said exchange, and as a condition to receiving a certificate of membership therein, each member is required to subscribe to said articles of association, by-laws, rules, and regulations, for which purpose a book is kept in the office of the secretary, in which are copied the articles of association, rules, and by-laws, in the order named, to which is signed the name of each member, either by himself or some authorized agent, and each of said plaintiffs, J. E. Greer and Frank O. Mills, subscribed to said articles of associa-

tion, rules, and by-laws, the same as other members, at the time of joining said exchange."

"7. Rules were adopted by said exchange, and were in force at the time plaintiffs became members thereof, including those above set out, except an amendment to section 5, rule 9, as hereinafter stated; and plaintiffs signed and agreed to faithfully observe and be bound by said rules. After the plaintiffs became members thereof, to wit, March 31, 1892, an amendment to section 5, rule 9, increasing the minimum charge for commissions, was made, and the manager for the plaintiffs was present and voted for said change."

"9. When a member of the exchange is suspended or expelled, or when one who is not a member attempts to do business as a live-stock commission merchant at said stock-yards, the board of directors of said exchange gives notice by posting on a bulletin-board, in a conspicuous place in the exchange building, requesting that no members of the exchange do business with such non-member, and the services of inspectors or dockers in the yards, being employees of the exchange, are also refused to such non-member or suspended or expelled members."

Rule 9, adopted and enforced by the association, contains the following provisions:

"Section 1. The commissions charged by members of this association for selling live stock shall not be less than the following-named rates:

"Sec. 2. Six dollars per car-load, for single-deck car-loads of hogs or sheep, and $10 per car-load for double-deck car-loads of the same : *Provided*, Members of this exchange may, after charging commissions as above provided, pay a regular sheep salesman on these yards a sum of money contingent on number of sheep sold; and said sheep salesman may be in the employ of other members of the exchange.

"Sec. 3. Fifty cents per head for cattle of all ages. In car-loads of 24 or more, not more than $12 per car-load; $10 per single-deck car-load, and $18 per double-deck car-load, of veal calves.

"Sec. 4. Fifty cents per head for cattle, and 25 cents per head for calves, and 10 cents per head for hogs and sheep in mixed car-loads — but not to exceed $12 per car-load.   Fifty cents per head for cattle and 25 cents per head for calves driven into the yards, and 10 cents per head for hogs and sheep, for 60 head or less; more than that number shall be charged for at car-load rates.

"Sec. 5. Fifty cents per head for buying cattle for stockers or feeders, *provided,* such charges shall not exceed $12 per car-load; $6 per single-deck car-load for buying sheep, and $10 per double-deck car-load. All purchases paid for by a commission house or shipping clearance made by same shall be deemed a purchase and charged for as above provided.

"Sec. 6. Not less than $4 per single-deck and $5 per double-deck car-load for buying live hogs, and not less than 3 cents per head for hogs bought by the head."

"Sec. 11. Any member of this association, or firm or corporation represented herein, sending or causing to be sent a prepaid telegram or telephone message quoting the markets, giving information as to the condition of the same, shall be fined not less than $100 nor more than $500.   If said fine is not paid within three days, said firm or member shall be suspended until said fine is paid: *Provided, however,* That prepaid message may be sent to shippers quoting actual sales of their stock on the day made; also to parties desiring to make purchases on this market.

"Sec. 12. Any member of this exchange, or firm or corporation in which he may be a partner, violating any of the provisions of this rule, shall be fined not less than $500 nor more than $1,000 for the first offense, and if said fine be not paid within three days said member or firm may be *suspended* from membership until same is paid.   For a second offense said member or firm may be expelled from membership in the exchange."

The particular rule which plaintiffs were charged with violating is that contained in above section 5,

the complaint stating that, through their agent, they bought certain cattle for feeders, for which service a commission was charged that was less than the minimum charges established by said rule. Various matters are urged by counsel for plaintiffs as reasons why they should have been granted the injunction prayed for, the principal ones being that the facts found by the court show that the charges made against them, and the trial thereof by the board of directors, were not made and had in good faith; that the rules of the exchange relating to the trial which were enforced against the plaintiffs are unreasonable and unjust; that the rule fixing the minimum commission charges is unreasonable, was enacted in aid of an unlawful combination in restraint of trade, is illegal and void; and, therefore, that the defendants should not be permitted to deprive the plaintiffs of their membership because of their failure to observe an illegal and void rule. On the part of the defendants, it is contended that the plaintiffs having had a fair and regular trial in accordance with the rules and regulations of the exchange, the result thereof is not subject to review by the courts; that such membership is not a property right that a court of equity will protect by injunction; that the action, even if maintainable, is prematurely brought, for the reason that no attempt has been made to enforce the payment of the fine by making an order of suspension; and that, if the rules and regulations which the plaintiffs are charged with violating are illegal and void, because against public policy and in violation of the laws of the state, a court of equity will not exercise its jurisdiction to aid them in retaining membership in such illegal organization.

Able and elaborate briefs have been filed by coun-

sel for plaintiffs and defendants, respectively, upon the several questions raised in this case. In the view, however, which we take, we do not deem it necessary to consider all of them, and shall content ourselves with a brief statement of the grounds upon which we think the judgment of the court below must be affirmed. It may be conceded that a membership in the Kansas City Live Stock Exchange is such a property right as will, in a proper case, be protected by a court of equity; and that, if equity would aid the plaintiffs in maintaining their right of membership, there has been such a threat and attempt to interfere therewith by the defendants as justifies the commencement of an action to restrain the threatened suspension. It may also be conceded that no society or association has a right to enforce against its members any rule or regulation which is unreasonable, or which is contrary to public policy or in violation of the law. But such considerations, in our opinion, fall short of the real questions involved in this case. It is admitted by the plaintiffs, and so alleged in their petition, that rule 9 was adopted for the purpose of effecting an illegal combination of the persons who were engaged in the live-stock commission business at Kansas City, and is in restraint of trade. The petition states, "that said rules above set out, to wit, rule 16, and sections 5, 12 and 15 of rule 9, are unreasonable, in aid of an unlawful combination, in restraint of trade, against public policy, and repugnant to and in violation of law."

By the seventh finding of facts, it appears that "the plaintiffs signed and agreed to faithfully observe and be bound by said rules"; and, after they had become members, and on March 31, 1892, they voted to amend said section 5 by increasing the minimum commission charges.

The articles of association and the rules and by-laws must be taken as a whole, in order to determine the character of this exchange. It matters not how meritorious and praiseworthy its declared objects may be; the law cannot be evaded by colorable pretenses. It looks at the substance of things, whatever disguise may be assumed to conceal it. It is impossible to read the articles of association and by-laws of this exchange without being convinced of the fact that the principal inducement is, not "to promulgate and enforce among the members correct and high moral principles in the transaction of business," as stated in the articles, but that it is, rather, to prevent competition along certain lines among those engaged in the live-stock commission business, and to maintain uniform minimum prices for their services. Thus, by section 11 of rule 9, a commission man or firm is prohibited, under penalty of a fine of not less than $500 nor more than $1,000, from sending a prepaid telegram giving information as to the condition of the markets to a farmer or stockman contemplating the sale or shipment of stock. Another rule prohibits members from doing business with one not a member who attempts to transact the live-stock commission business at the Kansas City stock-yards. These, and other rules of a like character, are, apparently, the main features of this organization, which make a membership therein so valuable. The exchange makes no pretense of giving direct aid to its members in securing business, but leaves that to their own individual efforts. Its profitableness, however, is no doubt greatly augmented by reason of the fixing of charges by a combination which is powerful enough to monopolize such services. An organization having such objects is an unlawful combination which is expressly prohibited by law. (Laws 1889, ch. 257.)

Combinations and associations which are entered into for an illegal restraint of trade are usually organized with great skill, and with a special view to covering up the unlawful purposes by professed designs and objects which are lawful; hence, the recognized difficulties which obstruct the enforcement of all general laws against unlawful trusts and combines. This fact, doubtless, induced the legislature of this state to enact a law which was specially designed to prevent and suppress unlawful combinations of persons engaged in buying or selling live stock for others on commission. (Laws 1891, ch. 158.) That act not only makes it unlawful for two or more persons or corporations engaged in such business to enter into any combination for the purpose of regulating the charges to be demanded, but it specially provides: "It shall be unlawful for any person or persons, or corporation or corporations, doing business in this state, to be or become a member of any society, association or corporation whose by-laws provide for and fix the minimum commission for the selling of live stock for others, or whose by-laws prohibit its members from purchasing live stock from persons who are not members of such society, association, or corporation," and any one violating its provisions is deemed guilty of a misdemeanor, and subject to severe penalties. The plaintiffs invoke the act to invalidate and nullify the by-laws which they are charged with violating; while the defendants contend that its legal effect is to put the plaintiffs in the position of asking the courts to maintain them in a membership which is a direct violation of the law.

The association of the persons composing the exchange is a voluntary one. Their mutual rights, of whatever nature, are contractual. Any right which

11—4 KAN. APP.

Greer v. Payne.

the plaintiffs may have to membership is based upon, and grows out of, the contract entered into between them and the exchange at the time they became members and signed the articles of association. The right to the relief which they ask against the threatened action of their associates is based upon the recognition of this contract; and granting the relief would be the solemn declaration of the law that they must not be deprived of its privileges and benefits. Not only is the entering into such contract relations expressly prohibited by the statute, but the simple act of continuing the relationship is made a misdemeanor, subject to severe penalties. The contract of membership is, therefore, illegal and void, and no right can grow out of it. Hence, it comes to this: A court of equity is asked to assist the plaintiffs in carrying out an illegal contract, so that they may enjoy its fruits, and to aid them in maintaining a position as members of an organization, which can be done only by a continual violation of the law. This will not be done. The law will not allow any effect to an illegal contract either by enforcing it or by aiding one to secure benefits accruing from it. Whenever it is necessary for a plaintiff to establish or rely upon an illegal contract as a basis of his right to relief, the courts will not stop to inquire into the merits of the controversy, but will at once refuse to exercise their jurisdiction in his behalf. The general rule is thus stated by Mr. Pomeroy:

"Whenever a contract or other transaction is illegal, and the parties thereto are, in contemplation of law, *in pari delicto*, it is a well-settled rule, subject only to a few special exceptions, depending upon other considerations of policy, that a court of equity will not aid a *particeps criminis*, either by enforcing the contract or obligation while it is yet executory, or by

relieving him against it by setting it aside, or by enabling him to recover the title to property which he has parted with by its means. The principle is thus applied in the same manner when the illegality is merely a *malum prohibitum*, being in contravention to some positive statute, and when it is a *malum in se*, as being contrary to public policy or to good morals." (Pom. Eq. Jur. § 402.)

See, also, *Mellison v. Allen*, 30 Kan. 382; *Water Supply Co. v. City of Potwin*, 43 id. 404; *Sheldon v. Pruessner*, 52 id. 579; *Yount v. Denning*, 52 id. 629; *Buchtella v. Stepanek*, 53 id. 373; *Woodworth v. Bennett*, 43 N. Y. 273; *Watson v. Fletcher*, 7 Gratt. 1; *Griffin v. Piper*, 55 Ill. App. 213; *Watson v. Murray*, 23 N. J. Eq. 257; *Spalding v. Preston*, 21 Vt. 9; *Abbe v. Marr*, 14 Cal. 210; *Nestor v. Brewing Co.*, 101 Pa. St. 474; *Rigby v. Connol*, 14 Ch. Div. 482; *Swaine v. Wilson*, 24 Q. B. Div. 252; *More v. Bennett*, 140 Ill. 69; *Salt Co. v. Guthrie*, 35 Ohio St. 666; *Coppell v. Hall*, 7 Wall. 542; *Armstrong v. Tolor*, 11 Wheat. 258; *Roby v. West*, 4 N. H. 285; *Dillon v. Allen*, 46 Iowa, 299.

While the above are, for the most part, cases in which the plaintiff sought to recover the fruits and benefits derived from an illegal contract, yet they all involve an application of the same principle. The mere fact that the courts in very few instances have been appealed to to aid a party in carrying out an illegal contract, or to enable him to enjoy future benefits to be derived therefrom, and that parties to such contracts, with few exceptions, have ventured into court only for the purpose of recovering something already earned, or damages previously sustained, is strong evidence of what the opinion of the legal profession has been upon this question. Our attention has been called to no case, and we know of none, in which a court of equity directed the specific perform-

ance of an executory contract which was tainted with illegality, or in which the parties to it were granted any assistance in carrying it out. *Rigby v. Connol,* supra, was an action similar to the one at bar, in which the plaintiff sought to restrain the trustees of a trades-union from excluding him from membership therein because of his violation of a rule which, he alleged, was illegal and void. It was held that, as the trades-union was an unlawful association, for the reason that some of its principal objects were in restraint of trade, the court would not aid the plaintiff in maintaining his membership therein. In the opinion it is said:

"It appears to me that it is clearly an unlawful association; it is an association by which men are not only restrained in trade, but they are bound to do certain acts under a penalty. Take the very act for which this man was expelled. He was expelled because he bound his son apprentice in a shop where the workmen did not belong to this union, but to another union. That is the allegation. And the rule is that any man binding his son in a 'foul shop,' which, as it has been explained to me, includes a shop of this description, where the members employed belong to another union and not to this union, shall be fined £5, and so on, according to the rules. I see a great number of other stipulations of a character which are not only a restraint in trade, but so much in restraint of trade, limiting the subject of it, that I have no doubt before this act [legalizing certain trades-unions] was passed these rules would have been altogether illegal; and if nothing in the act, therefore, will assist the plaintiff, he must still be in the position of a member of an illegal association coming to a court of justice to assist him to enforce his rights under that illegal association."

In *Spalding v. Preston,* supra, Redfield, J., said:

"One who sets himself deliberately at work to con-

travene the fundamental laws of civil governments —
that is, the security of life, liberty, or property — for-
feits his own right to protection in those respects
wherein he was studying to infringe the rights of
others. . . . If any member of the body politic,
instead of putting his property to honest uses, convert
it into an engine to injure the life, liberty, health,
morals, peace or property of others, he thereby for-
feits all right to the protection of his *bona fide* interest
in such property before it was put to that use."

In *Coppell v. Hall*, supra, considering the principle
involved in such cases, it is said:

"In such cases there can be no waiver. The de-
fense is allowed, not for the sake of the defendant,
but of the law itself. The principle is indispensable
to the purity of its administration. It will not en-
force what it had forbidden and denounced. The
maxim, *ex dolo malo non oritur actio*, is limited by no
such qualification. The proposition to the contrary
strikes us as hardly worthy of serious refutation.
Whenever the illegality appears, whether the evidence
comes from one side or the other, the disclosure is
fatal to the case. . . . Wherever the contamina-
tion reaches, it destroys. The principle to be ex-
tracted from all the cases is, that the law will not
lend support to a claim founded upon its violation."

In *Roby v. West*, supra, the following forcible lan-
guage is used:

"The principle that no court shall aid men who
found their cause of action upon illegal acts, is not only
well settled, but a most salutary principle. It is fit
and proper that those who make claims which rest
upon violations of the law should have no right to be
assisted by a court of justice. It is fit and proper that
courts should refuse their aid to those who seek to ob-
tain the fruits of an unlawful bargain. It is fit and
proper, when parties come into court to litigate claims
founded upon illegal contracts, in relation to which
they stand *in pari delicto*, that they should be reviewed

and treated in those transactions as outlaws who have forfeited the protection of the law; and it is fit and proper that they should be left to adjust their unlawful concerns as they can, and enjoy the fruits of their transgressions of the law as they may."

The general rule is thus summarized by the court in the syllabus in *Buchtella v. Stepanek*, 53 Kan. 373:

" Where parties purposely engage with equal guilt in illegal, immoral or fraudulent dealings, the court leaves them where it finds them, and will not lend its aid to either party."

A very plausible and ingenious argument is made by the able counsel for plaintiffs, to the effect that a denial of the relief prayed for will keep the defendants in a position where they can enforce their illegal by-laws against members, and thus perpetuate their existence as an unlawful organization; whereas, the granting of the relief would be a virtual wiping out of such illegal by-laws, and the exchange, with its members, would be left to conduct its business under valid and lawful rules and regulations. It is contended that the plaintiffs should be aided in resisting the enforcement of the illegal rules, and the defendants given to understand that such regulations and agreements will not be recognized nor upheld by the courts. The argument is presented with much force and ability; but, in our opinion, it ignores the vital facts in this case and calls for an abandonment of well-settled rules of law. We must not lose sight of the nature and object of this action. The plaintiffs' purpose is not to wipe out illegal by-laws. It is to prevent the wiping out of an unlawful membership. They seek to avoid the enforcement as against them of rules which, as alleged in their petition, they have been zealous and faithful in living up to and in en-

forcing against others.   If retained as members, they would no doubt, in the future as in the past, not deny themselves the opportunity thus afforded to acquire illegal gains.

When an association of this character comes before a court of equity, it will not stop to weed out the illegal growths which have fastened themselves upon it, and endeavor to fashion out of it something that is entitled to judicial recognition.   It is clear that any order or judgment, whether for the plaintiffs or for the defendants, which the court could render in this case, would not eliminate from the exchange the obnoxious by-laws.   So far as this action is concerned, they will remain without change.   The organization itself will continue with unimpaired ability to violate the law, and with impunity to trample upon the public interests.   A membership therein, after the judgment of this court is rendered, will be as much within the prohibition of the statute as it was before this action was commenced.   These parties have, by their voluntary acts, created an organization which the law condemns, and one with which no man can be connected without being answerable to the laws of the state as a criminal.   Clearly the law will not aid them under the circumstances.   A court of equity takes them as it finds them, and as it finds them it leaves them, undeserving of aid and assistance in a matter which inheres in, or grows out of, their illegal contracts.

These principles, which in our opinion are of vital and controlling importance in this case, require an affirmance of the judgment.

All the Judges concurring.