## Commonwealth v. Waxman and Dimitroff.

*Money paid as a bribe—Disposition of.*

Money in the hands of a member of the Pennsylvania State Constabulary, paid to him as a bribe to induce him to discontinue a criminal prosecution, should be turned over to the treasurer of the county in which the prosecution was instituted.

Rule to show cause why money paid as a bribe should not be turned over to the county treasurer. Q. S. Dauphin Co., Jan. Sess., 1923, No. 136.

*Philip S. Moyer*, District Attorney, and *E. LeRoy Keen*, Assistant District Attorney, for Commonwealth.

*Robert Stucker*, for defendant.

WICKERSHAM, J., May 7, 1924.—The defendants were indicted to the number and sessions above stated upon the charge that on Nov. 29, 1922, they did unlawfully pay to Rodney W. Shaver, the prosecutor, the sum of $294 in cash and a check for $6, as and for a bribe, to procure and induce the prosecutor, a member of the Pennsylvania State Constabulary, in a certain prosecution instituted against one Grover C. Furl and Cora A. Furl, his wife, to discontinue the said prosecution against the said Furls, who were charged with the illegal possession and transportation of intoxicating liquor.

The indictment was tried Jan. 12, 1923, which resulted in the conviction of the defendants of the charge of bribery, and sentence was duly imposed upon the said defendants; whereupon Rodney W. Shaver, the prosecutor in said case, petitioned this court "for instructions touching the disposition of the money and check aforesaid in his custody." Aug. 21, 1923, on motion of the district attorney, a rule was granted on H. Waxman, one of the defendants, to show cause why the said sums of money now in the custody of Rodney W. Shaver, the prosecutor, should not be paid to the county treasurer.

No answer has been filed to this rule by either of the defendants. After this opinion was dictated, our attention was directed to a demurrer prepared by counsel for the defendant, Waxman, which was never filed, and which we have ordered to be filed *nunc pro tunc*. The demurrer sets forth that there is nothing upon the face of the petition to justify the granting of the rule to show cause, there is no authority in law to cause a forfeiture of the money referred to in the petition aforesaid, and there is no act of assembly in this

Commonwealth which would justify the forfeiture of the defendant's money. Counsel for the defendant, Waxman, contended that unless the Act of March 31, 1860, P. L. 382, provides for a forfeiture of the thing used in the commission of the bribery or attempt to bribe, the only punishment would be that fixed by the Act of March 31, 1860, and that no forfeiture of the thing used in the commission of the offence is provided for. It is not contended in the defendant's brief from which we have just quoted that the money in the hands of the petitioner, Rodney W. Shaver, should be repaid to the defendant, H. Waxman, who paid the bribe money to the said Shaver. Their only contention is that the rule granted in this case should be discharged. This contention overlooks the request of the petitioner "for instructions touching the disposition of the money and check aforesaid in his custody."

Our attention is further directed in the brief of counsel for the defendant, Waxman, to a *dictum* found in 8 Ruling Case Law, 257, to wit: That "the forfeiture and disabilities imposed by the common law on persons attainted of felony are unknown to the laws of this country, and no consequences follow conviction and sentence, except such as are declared by law."

The forfeitures referred to by the text from which we have quoted are those mentioned in paragraph XVI, 1 Blackstone's Commentaries, page 299, which relates to the King's revenue, and which provides that "if, therefore, a member of any national community violates the fundamental contract of his association by transgressing the municipal law, he forfeits his right to such privileges as he claims by that contract, and the state may very justly resume that portion of property, or any part of it, which the laws have before assigned him. Hence, in every offence of an atrocious kind, the laws of England have exacted a total confiscation of the movables or personal estate, and in many cases a perpetual, in others only a temporary, loss of the offender's immovables or landed property, and have vested them both in the King, who is the person supposed to be offended, being the one visible magistrate in whom the majesty of the public resides."

It is not contended by the Commonwealth that the *bona confiscata* of the English common law is in force in Pennsylvania, nor that all the goods and chattels of the defendant, Waxman, could be confiscated by the Commonwealth. The district attorney, representing the Commonwealth, does contend that the law distinguishes between the rights acquired in conformity with and arising under its provisions, and claims originating in their clear and palpable violation; that it will not enforce claims made in contravention of its mandates, nor protect property held against and being used for the deliberate purpose of disobeying its enactments. A different course would be suicidal. The law cannot lend its aid to the destruction of its own authority and to the disobedience of its own commands. The common law will afford no aid to a party whose claims can be successfully enforced only by a violation of its principles or in direct contravention of a statutory enactment. *Ex turpi causa non oritur actio*: Brooms's Legal Maxims, 732, 738, 739; Lord v. Chadbourne, 42 Me. 429; 66 Am. Dec., 290, 291, 292.

The money in question is now in possession of the petitioner, Rodney W. Shaver. It was paid to him by Waxman as a bribe to secure the release of the Furls. It was not used by Shaver to accomplish the purpose for which it was paid to him by Waxman. The purpose sought to be accomplished by Waxman in thus paying said sum of money to Shaver was clearly illegal; it was, in fact, criminal in its intent. Therefore, if a civil suit were brought by the defendant, Waxman, against Rodney W. Shaver to recover from him the money paid to him as a bribe by the said H. Waxman, no recovery could be

Commonwealth *v.* Waxman and Dimitroff.

had because of his, Shaver's, failure to perform his part of the contract: Albertson *v.* Laughlin et al., 173 Pa. 525, in which it was held that a court of equity will not lend its aid in a gambling transaction, either to the winner to compel payment of his unpaid gains, or to the loser, who has paid his losses, to recover them back.

Morgan *v.* Groff, 5 Denio, 364, 49 Am. Dec., 273, holds that money advanced to another to be bet on an election, or to be used to violate the provisions of any public statute, cannot be recovered back, though never used by the receiver for the purpose for which it was sent.

Spalding *v.* Preston, 21 Vt. 9, 50 Am. Dec., 68, was an action of trover against the Sheriff of Caledonia County for 1100 pieces of German silver of the precise size and thickness of a Mexican dollar, and made in that form for the purpose of being stamped and milled into counterfeit coin of that description. The defendant took them within his own county from one Russell, who is shown by the case to have been carrying them, at the time, to a place of manufacture for the purpose of having them finished, so that he could put them in circulation as genuine coin. They were originally taken from Russell, and at the time of the trial were still detained under the authority of the State's Attorney of Caledonia County. Russell was indicted by the grand jury of that county, and the indictment was still pending. These pieces of partly finished counterfeit coin were detained for the double purpose of being used as evidence upon the trial of Russell, and also of preventing their being put in circulation. These pieces of counterfeit coin were, at the time of the seizure by the defendant, the property of one Foster, so far as property can exist in such a thing, and Foster, after the seizure, transferred his rights therein to the present plaintiff. The court below rendered a judgment for the plaintiff, wherein they estimated for him the value of his property upon some standard, either of its cost or its utility for honest or fraudulent purposes. The Supreme Court of the State of Vermont reversed the judgment of the court below in an opinion written by Judge Redfield. We are impressed with his reasoning, from which we quote and which we adopt:

"All governments, upon the most obvious principles of necessity, exercise more or less of preventive force in regard to all subjects coming under their cognizance and control. This is in analogy to the conduct of individuals, and, indeed, of all animal existence. Many of the instincts of animals exhibit their most astonishing developments in fleeing from the elements, from disease, and from death, at its most distant sound, long before the minutest symptom appears to rational natures. This is the great secret of personal enterprise and success. So, too, in the history of civil governments, prevention is more important and far more available than cure. All santitary cordons and preventive regulations, everything in regard to the police of our cities and large towns, indeed, prohibitions of lotteries, gambling-houses, brothels and disorderly taverns, whether done by general statutes or mere police regulations, all come under the right of preventing more serious injuries by stifling the fountains of evil. *Obsta principiis* is as just a maxim here as anywhere. And in doing all this, it must, of course, somewhat interfere with the natural rights of individuals. One infected with contagion is instantly removed beyond the reach of contact. A ship, or cargo, coming from an infected port is subjected to long delay and great expense to prevent the possibility of spreading pestilence. This may in some instances endanger the lives and health of the individuals concerned, and must always more or less affect property and abridge personal liberty. And it is often done without any special law of the state, and may always be so done—as in the case of cholera suddenly breaking out

in some remote inland town. And what would be thought of an action of assault and battery brought against a health officer who removed the plaintiff from a town or village to prevent contagion; or against the peace officer who laid his hand upon one under an honest belief that he was insane, or when he was in fact so, and rushing through the street with a lighted torch to burn some public edifice, or commit some other irreparable injury? Or, if you please, against the sheriff of the county, who, by the direction of the prosecuting attorney for the state, detains counterfeit coin, or those partly finished? (See page 71.)

". . . And if the right of personal liberty, which is always reckoned among the most sacred of civil rights, may be thus violated by private persons upon their own mere motion, much more, it would seem, may such rights of property as one may be supposed to have, either in counterfeit coin or in the materials in an unfinished state, be disregarded by a public officer.

"The following is the law as laid down in 6 Bac. Abr., title Trespass, *D*, 579, upon that subject: A private person may, without express warrant, arrest persons who are actually fighting, and keep them in custody until their passion is over. Has the state of safety yet occurred in regard to this coin? If surrendered, it would seem there should be some security that it should not be applied to the same use. Certainly not in this state."

After discussing the right of private persons to make arrests without express warrant, the learned justice proceeds:

"Will it, then, be said the sheriff is liable to this action? We shall only mention two other grounds upon which we think it impossible to maintain this action. 1. It was necessary to detain this base metal as a matter of evidence against Russell. A mere description, either of the form or quality of the pieces, would be much less satisfactory than the inspection by the jury and witnesses upon the stand. 2. Courts of justice will not sustain actions in regard to contracts or property which have for their object the violation of law. If a gang of counterfeiters had quarreled about the division of their stock or tools, a court of justice could hardly be expected to sit as a divider among them. If one had taken the whole in violation of the laws by which such associations subsist, a court of law could not interfere, because it is not presumed to be expert in such questions. And, if it were, it is considered a public scandal that such matters should be there discussed or adjusted. Such property is, so to speak, outlawed and is common plunder. One who sets himself deliberately at work to contravene the fundamental laws of civil governments, that is, the security of life, liberty or property, forfeits his own right to protection in those respects wherein he was studying to infringe the rights of others. The man who attempts the life or the liberty of another forfeits for the time all right to the protection of his own life or person; and the person assailed may justly destroy both, if necessary, in his own defence, or if he may be fairly supposed to have esteemed it necessary under the circumstances. So, too, if any member of the body politic, instead of putting his property to honest uses, convert it into an engine to injure the life, liberty, health, morals, peace or property of others, he thereby forfeits all right to the protection of his *bona fide* interest in such property before it was put to that use. And he can, I apprehend, sustain no action against any one who withholds or destroys his property with the *bona fide* intention of preventing injury to himself or others:" 50 Am. Dec., 73-74.

We have no difficulty in concluding, therefore, that if Waxman had commenced an action of trespass in the nature of trover and conversion to recover the sum of money in question from Rodney W. Shaver, the prosecutor, he

could not have prevailed; nor could he prevail in any other action which he might have brought to recover this money. We conclude, and so hold, that he cannot prevail in this, his attempt to control the disposition of the money in the hands of the prosecutor. It is alleged, and not denied, that he, Waxman, paid the above stated sum of money to the prosecutor in this case in order to influence his action in another prosecution which he had instituted, for which offence the said Waxman was indicted, tried and convicted of the crime of bribery. Our attention has not been directed, nor have we been able to find in the courts of this or any other state any legal authority in support of the contention of his counsel that this bribe money should be returned to him, and, therefore, the demurrer of the defendant is overruled.

In Com. v. Brown, 16 Dist. R. 537, it was held by the Court of Quarter Sessions of Philadelphia County that "money in the hands of the district attorney cannot be returned to the man who paid it to the officer as a bribe. It is not claimed by the officer, and if he claimed it now, it could not be given to him. The district attorney is merely the custodian of it. There seems to be no statute governing such matters. There is, then, no disposition to be made of the money except to turn it over to the treasurer of the county—to the people." The learned judge of the Court of Quarter Sessions of Philadelphia County has not cited any authority in support of his ruling, but we have no doubt he had applied to the case the principle which we find so clearly expressed in the authorities which we have quoted. We are of opinion, therefore, that this money in the hands of the prosecutor, Rodney W. Shaver, should be turned over to the Treasurer of Dauphin County—to the people.

The rule granted in this case is, therefore, made absolute, and the petitioner, Rodney W. Shaver, is directed to pay the money now in his hands, as set forth in said petition, to the Treasurer of Dauphin County.

From George R. Barnett, Harrisburg, Pa.