### HELLER & MERZ CO. v. SHAVER et al.

(Circuit Court, N. D. Iowa, Cedar Rapids Division. June 23, 1900.)

**1. Unfair Competition—Grounds for Relief.**

It may be stated as a general principle, underlying the law of unfair competition, that nobody has the right to sell his goods as the goods of somebody else.

**2. Same—Selling Different Goods under Same Name.**

Complainant was a manufacturer of laundry bluing sold under the brands "American Wash Blue" and "American Ball Blue." For some 10 years a firm handled these products, and introduced them to the trade in its territory under such names. At the end of that time the firm went out of business, and defendants purchased its assets, advertised themselves as its successors, and as "manufacturers of American Wash Blue and American Ball Blue"; claiming the right to use such brands, and selling thereunder, in the same territory, the product of a different manufacturer. *Held*, that such action was a fraud upon the public, and constituted unfair competition as to the complainant, which entitled it to the protection by injunction, regardless of the question whether it had a right to the exclusive use of the names as trade-names.[1]

**3. Equity—Right to Relief—Doctrine of Clean Hands.**

A complainant's right to relief in equity against unfair competition cannot be defeated on the ground that it has been guilty of fraud in misrepresenting to the public the origin of an article manufactured by it, which is not involved in the suit.

In Equity. Suit to enjoin unfair competition in trade. On final hearing.

Edmund Wetmore and Rothrock & Grimm (Rowland Cox and Herman Gustow, on the brief), for complainant.

Offield, Towle & Linthicum and U. C. Blake, for defendants.

SHIRAS, District Judge. The purpose sought by complainant in this case is to restrain the defendants from making use of the brands "American Ball Blue" and "American Wash Blue" in the sale of ultramarine blue manufactured by parties other than the complainant corporation. The evidence shows that about the year 1870 the firm of Heller & Merz engaged in the business of manufacturing and selling ultramarine blue or bluing at Newark, N. J.; that in January, 1889, the partners formed a corporation under the laws of the state of New

[1] Unfair competition in trade, see notes to Scheuer v. Muller, 20 C. C. A. 165, and Lare v. Harper & Bros., 30 C. C. A. 376.

Jersey, which succeeded to the business and rights of the pre-existing firm, and has since conducted the business of manufacturing and selling ultramarine blue under the corporate name of the Heller & Merz Company. It is further shown in the evidence that, about the year 1875, the firm of Heller & Merz prepared and put upon the market a laundry blue under the designation or brand of "American Wash Blue," and in the year 1876 they put upon the market what is known as "American Ball Blue." It also appears that in these years the firm of Pomeroy & Olmsted were engaged in business at Cedar Rapids, Iowa, as manufacturers of laundry soaps and jobbers of sal soda and rosin, and in 1878, if not earlier, they became interested in the sale of the ultramarine blues manufactured by Heller & Merz. The relation which existed between the parties is made clear by the following letters written by Pomeroy & Olmsted:

Office of Pomeroy & Olmsted, Manufacturers of Laundry Soaps and Jobbers of Sal Soda and Rosin.

Cedar Rapids, Iowa, Feby. 12, 1878.

Messrs. Heller & Merz, New York City—Gentlemen: Inclosed find drft. to your order for one hundred forty-three & $70/100$ dolls.; also, duebill for (1) case W. blue, for which we allowed $3.50. Can we chrg. tour a/c with that amt? Please send one bbl. blue (10 cakes in each pckg., same as we have had) & we would like some cards to paste on our boxes, and any other ad. matter you think would tell. We can distribute it to good advantage. What would you charge us for 50 bxs. put up with our name on & in good shape? If you would make us figures, we would endeavor to reach the jobbing trade that are not now handling your goods. Think the blue, as we get it, suits the trade of this section better than would the ball. Awaiting your acknowledgment of receipt, we remain,

Yours, truly, Pomeroy & Olmsted.

Office of Pomeroy & Olmsted, Manufacturers of Laundry Soaps and Jobbers of Sal Soda and Rosin.

Cedar Rapids, Iowa, July 5th, 1878.

Messrs. Heller & Merz, New York City—Gentlemen: Your proposition to furnish us the wash blue in lots of 100 boxes, put up with our name, &c., at $2.50, is accepted and we shall endeavor to dispose of what we have first recd. as speedily as possible. We have kept steadily at work, introducing the blue, wherever we could get merchants to try it, and, though some have returned it, we were confident it was no fault of the article itself, but rather that of the ones using. Now, however, we begin to have calls for it from parties who have been selling other blues, and the prospect is very encouraging. You may have inquiries for prices & perhaps orders for it from dealers in this section of the country. If so, we trust you will refer them to us, and believe it to be to your, as well as our, interest to do so. We have made the prices very reasonable ($3.50 to retailers and $3.00 to jobbers), and assure you will make every effort to push the goods. You may look for an order from us in a short time.

Yours, very truly, Pomeroy & Olmsted.

P. S. Any advertising matter you may send us will be carefully distributed. Would it not be a good idea to put some nice show cards in our soap boxes? It would scatter them very generally. Anything our traveling men could carry with them, and scatter along in the stores and towns they visit, if you will send, we will see it so disposed of. Please give the matter your attention and oblige, P. & O.

Some time about the end of the year 1879, E. F. Pomeroy retired from the firm of Pomeroy & Olmsted, and the business was carried on in the name of G. M. Olmsted & Co., and the following letters were sent by them to Heller & Merz:

T. M. Sinclair, President.　H. B. Soutter, Secretary:　G. M. Olmsted, Treasurer.

G. M. Olmsted & Co. (Incorporated), Soap Makers, and Agents for American Wash Blue.

Cedar Rapids, Iowa, May 29th, 1880.

Messrs. Heller & Merz, New York City—Gents: Please send us 100 boxes "Am. Wash Blue." If you can substitute our name for that of P. & O. on the label without too much trouble, we would be pleased to have you do so. Will send drft. to balance a/c in short time. What discount do you give for cash on receipt of invoice?

Yours, truly,　　　　　　　　　　　　　　　　G. M. Olmsted & Co.

T. M. Sinclair, President.　H. B. Soutter, Secretary.　G. M. Olmsted, Treasurer.

G. M. Olmsted & Co. (Incorporated), Soap Makers, and Agents for American Wash Blue.

Cedar Rapids, Iowa, June 25th, 1880.

Messrs. Heller & Merz, New York City—Gents: Inclosed we hand you S. D. for two hundred eighty-six and $^{00}/_{100}$ dolls. to bal. on a/c. Please send receipt. We have heard nothing from our order of May 29th. Can we expect the goods soon? Have been entirely out for two weeks, and have orders now for 25 bxs. We have established depots for sale of our soaps in Dakota, Minnesota & Sioux City and Des Moines, to ship to these points in car-load lots, and have put in the blue also. In this way we have (6) different jobbing houses introducing the goods, and we believe we will very largely increase our trade in your blue, though in meantime it obliges us to carry a large stock at these different points. People here West are slow to take hold of new articles unless they are guarantied to give satisfaction, and we have found it very hard work to battle against the bottle blue, which is very universally used in this part of the country. We are gradually, however, overcoming the prejudice, and, when once used right, find no trouble in selling again. If you would put a cheap wrapper around each package, with instructions for using plainly & simply printed thereon, it would be a great benefit to us all. A great many instances have come to our knowledge of consumers dropping the cake directly into the water, and of course were not satisfied, and ready at once to declare the blue a humbug. Our traveling men say, "We could sell far more if it was put up in smaller boxes, and so as to retail for 5c." Could you not put up the blue, say 5 lozenges in a package, and 30 packages in a box, same style in every respect otherwise? Please give us figures at once, and, if so we can see a fair margin, will take 100 bxs. Our Mr. Pomeroy, having gone into the soap business at Minneapolis, Minn., will very likely wish to handle the blue there. As we have worked up a trade in Southern Minnesota & Dakota, he would very likely trespass on that territory and injure us. If you will refer him to us, we will sell him at a very small advance, or, if you will put it up in a different style entirely for him, we will not object. Hoping to hear from you at once, and trusting we shall soon be in receipt of the blue ordered, we remain.

Very truly yours,　　　　　　　　　　　　　　　G. M. Olmsted & Co.

P. S.　Please name discount you are willing to give for cash.

In 1897, and after the death of G. M. Olmsted, the defendants, having associated themselves in business under the firm name of Shaver, Blake & Co., bought the assets of G. M. Olmsted & Co., and announced themselves as successors to G. M. Olmsted & Co., and as manufacturers of American Ball Blue and American Wash Blue, addressing to the trade letters, of which the following is a sample:

Shaver, Blake & Co., Successors to G. M. Olmsted & Co.,

Manufacturers of American Ball Blue, American Wash Blue.

Cedar Rapids, Iowa, Aug. 18, '98.

Kothe, Wells & Bauer, Indianapolis, Ind.—Gentlemen: We desire to again call your attention to our quotations of one and two ounce American Ball

Blue, and the fact that we guaranty the quality. Any letters that you may receive from competitors, advising you that we have no right to the name "American Ball Blue," we would ask you to forward to us, and we will promptly give them the attention they deserve. We assure you that we have an undisputable right to the brand, and shall continue offering it. We have had the brand American Wash Blue on the market for twelve years, and shall continue to offer it, together with American Ball Blue, at greatly reduced prices. We would appreciate your correspondence and inquiries, and would solicit the opportunity of submitting samples.

Very truly yours,                              Shaver, Blake & Co.

It will be noticed that, so long as the business at Cedar Rapids was conducted by the firms of Pomeroy & Olmsted and G. M. Olmsted & Co., they were acting in unison with the complainant, and were engaged in advertising and selling the product manufactured by Heller & Merz, using, in so doing, the names of "American Wash Blue" and "American Ball Blue." When the defendants, claiming to be the successors of G. M. Olmsted & Co., entered into business at Cedar Rapids, they became at once competitors with complainant in the sale of laundry blue, and they represented that they were the manufacturers of American Ball Blue and American Wash Blue, having an indisputable right to the brand "American Wash Blue." This competition at once affected the business of complainant, and, as the letters from their customers printed in the record clearly disclose, the action of defendants caused the question to arise as to the party entitled to use the brands "American Wash Blue" and "American Ball Blue"; and thereupon, to settle this question, and to protect its alleged rights, the complainant instituted the present suit, and thus the court is called upon to ascertain and determine whether complainant has any such interest in or right to the named brands as entitles it to restrain the defendants from making use of these brands in connection with the business carried on by them. That these brands have acquired a commercial value cannot be questioned. Unless this were so, the defendants would certainly not be willing to incur the expense of litigation over the right to the use of the brands, and therefore it may be assumed, without further discussion, that the right to the use of the brands is a matter of recognized value. This value pertains to the brands, because, through past use and experience, the public have learned that the commodity sold under these names and descriptions is one of a certain degree of merit. This value acquired by the brands in question was wholly derived from the use of the bluing manufactured by Heller & Merz, for it is clearly shown in the evidence that the firms of Pomeroy & Olmsted and G. M. Olmsted & Co. were not manufacturers of bluing, but dealt only in the product furnished them by Heller & Merz, either directly or through the Consolidated Ultramarine Company. When the firm of G. M. Olmsted & Co. ceased to do business, owing to the death of G. M. Olmsted, the situation was as follows: The present complainant was the manufacturer of the commodities sold under the names or brands of "American Wash Blue" and "American Ball Blue." From the year 1880 to the year 1898 the firm of G. M. Olmsted & Co., advertising themselves as agents for American Wash Blue, had been engaged in selling complainant's product in Iowa and adjacent territory, acting, not in competition to, but in conjunction with, complain-

ant. If, in 1898, the firm of G. M. Olmsted & Co., ceasing to act as agents for the sale of complainant's products, had advertised to the public that they were the manufacturers of American Wash Blue and American Ball Blue, having had the former brand on the market for a period of 12 years, but, instead of furnishing to their customers the commodities previously sold under these brands, they had substituted others in place thereof, would not the firm have been fairly chargeable with the perpetration of a fraud both upon the complainant and also upon the public? The evidence justifies the assumption that from long use these brands' had come to represent to the public specific articles, which were in fact the product of complainant's manufactory, and in fact the commodities sold under these names by the firm of Olmsted & Co. were manufactured by Heller & Merz. Though the name of the manufacturer was not connected with the brands, and the customers might not know by whom the article was made, yet the brands described to the customer a specific article or commodity, and after the firm of Olmsted & Co. had been instrumental in introducing to their customers a specific article known by the name of "American Wash Blue" or "American Ball Blue," manufactured by complainant, the public certainly would be misled and deceived if the firm should substitute the product of another manufacturer for that of complainant, but should assure the public that it was the same article that they had sold for years under the name of American Wash or Ball Blue. Such conduct would be within the condemnation of the recognized rule that no one is justified in inducing the public to buy wares in fact manufactured by A. by representing that they are made by B. Thus, in Coats v. Thread Co., 149 U. S. 562, 13 Sup. Ct. 966, 37 L. Ed. 847, it is said:

"Rival manufacturers may lawfully compete for the patronage of the public in the quality and price of their goods, in the beauty and tastefulness of their inclosing packages, in the extent of their advertising, and in the employment of agents, but they have no right, by imitative devices, to beguile the public into buying their wares under the impression they are buying those of their rivals."

That such conduct would also be a fraud upon the rights of complainant is equally clear. The evidence demonstrates the fact that Heller & Merz were the manufacturers of the commodities that were sold under the names of "American Wash Blue" and "American Ball Blue," and it was the quality of these commodities that gave a commercial value to the names or brands under which they became known in the community. The evidence also shows that Heller & Merz furnished the signs, labels, and other advertising material that were used in bringing the commodities designated by these brands before the public; and certainly, under such circumstances, it would have been a fraud upon part of Olmsted & Co. if they had undertaken to compete with complainant by asserting that in fact they were the manufacturers of the commodities in question, and the owners of the brands by which they were known and designated by the trade. Thus, in McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828, it is said:

"Equity gives relief in such cases upon the ground that one man is not allowed to offer his goods for sale, representing them to be the manufacture of another trader in the same commodity. Suppose the latter has obtained celeb-

rity in his manufacture, he is entitled to all the advantages of that celebrity, whether resulting from the greater demand for his goods or from the higher price the public are willing to give for the article, rather than for the goods of the other manufacturer, whose reputation is not so high as a manufacturer. Where, therefore, a party has been in the habit of stamping his goods with a particular mark or brand, so that the purchasers of his goods having that mark or brand know them to be of his manufacture, no other manufacturer has a right to adopt the same stamp, because, by so doing, he would be substantially representing the goods to be the manufacture of the person who first adopted the stamp, and so would or might be depriving him of the profit he might make by the sale of the goods which the purchaser intended to buy."

In Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 537, 11 Sup. Ct. 396, 34 L. Ed. 997, after stating the general rule in the following words: "Undoubtedly, an unfair and fraudulent competition against the business of the plaintiff, conducted with the intent, on the part of the defendant, to avail itself of the reputation of the plaintiff to palm off its goods as plaintiff's, would, in a proper case, constitute ground for relief,"—the court quoted with approval the language of Mr. Justice Bradley in Nail Co. v. Bennett (C. C.) 43 Fed. 800, wherein it was said:

"There is here a substantial fact stated,—that the public and customers have been, by the alleged conduct of the defendants, deceived and misled into buying the defendants' nail for the complainant's. Whether this is in itself a good trade-mark or not, it is a style of goods adopted by the complainant, which the defendants have imitated for the purpose of deceiving, and have deceived, the public thereby, and induced them to buy their goods as the goods of the complainant. This is a fraud."

Under the principle recognized in these cases, and under the circumstances of the relation existing between the complainant and Olmsted & Co., it needs no further citation of authorities to show that if that firm had undertaken to avail themselves of the reputation acquired by the products of the complainant, by advertising themselves to be the manufacturers of the commodities sold under the brands "American Wash Blue" and "American Ball Blue," and to be the owners of these brands, a court of equity would have restrained them from thus unfairly competing with complainant on the ground that their claim to the use of these brands was unfounded, and was in fact a fraud upon the public and the complainant alike. The present defendants certainly stand in no better position in this particular than Olmsted & Co., whose successors they claim to be. Having bought the assets of that firm, the defendants advertised themselves as successors to G. M. Olmsted & Co., as manufacturers of American Wash Blue and American Ball Blue, as having an indisputable right to the brand "American Ball Blue" and as having had the brand "American Wash Blue" on the market for 12 years. The evidence shows that the defendants are not manufacturers of bluing in any form, but at present they obtain the goods sold by them from the International Ultramarine Works of New York. It cannot be denied, therefore, that the defendants are seeking to carry on the business of selling bluing in Iowa and adjacent states by availing themselves of the credit and reputation acquired by the commodities manufactured by the complainant, and which are known to the public as "American Wash Blue" and "American Ball Blue"; and by the assertions that they are the successors to

G. M. Olmsted & Co., by whom the complainant's goods were handled, and that they are the manufacturers of these brands of goods, having an indisputable right to the use of the brands, they are imposing upon the public to the injury of complainant,—a condition of affairs that clearly entitles the complainant to a restrictive injunction, unless some one or more of the defenses pleaded by the defendants are sufficient to defeat the equity relied upon by complainant.

The first contention of defendants is that complainant cannot maintain a right to a trade-mark in the designation "American," that being a geographical name, and intended merely to affirm that the articles sold under that description are of domestic, and not of foreign, origin. If the complainant's right to relief was based solely upon the claim of a trade-mark, or, in other words, if complainant could not sustain the suit except by claiming a strict right to a trade-mark in the brands "American Wash Blue" and "American Ball Blue," the position of the defendants that the word "American," being a geographical name, cannot be appropriated by any one person as a trade-mark, would be sustained by the authorities. The ground, however, upon which complainant bases its claim to relief, is not that these words constitute a trade-mark, but that they have acquired a special meaning, in the nature of brands, designating the articles manufactured by complainant; and the effort of defendants to utilize these brands in the furtherance of their trade constitutes unfair competition in business, which may be restrained when otherwise a fraud will be perpetrated on the public. This principle is perhaps as clearly stated in Saxlehner v. Apollinaris Co., 13 Law Times Rep. 258, cited in Flour-Mills Co. v. Eagle, 30 C. C. A. 386, 86 Fed. 608, 41 L. R. A. 162, as in any of the authorities to be found upon the point. It appeared in that case that the complainant was the owner of a mineral spring in Hungary named "Hunyadi Janos," and the defendant for a long time acted as exclusive agent for the sale of the waters in England. Upon the termination of the contract of agency, the defendant began selling water from another Hungarian spring, calling it "Uj Hunyadi," and, upon suit brought, an injunction was granted, it being stated in the opinion of the court that:

"The plaintiff's case, as thus opened, was brought distinctly within the authority of Reddaway v. Banham [1896] App. Cas. 199, which, be it observed, was decided by the house of lords some time before the writ issued. * * * I have studied the case with this view, and it seems to me the entire doctrine is summed up in one sentence in the first paragraph of the lord chancellor's speech moving the judgment of the house. 'Nobody has the right to represent his goods as the goods of somebody else.' Observe that the proposition is perfectly general. There is no limit as regards name, origin, honesty of manufacture or sale, or otherwise. * * * It matters not, therefore, how a plaintiff's goods have come to acquire a particular value, or how the defendant's goods have come to adopt that value. If, in fact, the defendant is selling his goods as those of the plaintiff, he is doing what the law will not allow, and the plaintiff is entitled to relief against him."

It will be noticed that in this case the goods of the plaintiff were known in England as "Hunyadi Janos"; it was this name or brand that had acquired a significance, without reference to the name of the party dealing in them; and the defendant was restrained from advertising other water under a name so similar that it would mislead the

public into believing that they were the same. The facts, therefore, which in that case were held to entitle complainant to relief, are strictly analogous to those relied on by the complainant in the present case. In Flour-Mills Co. v. Eagle, 30 C. C. A. 386, 86 Fed. 608, 41 L. R. A. 162, the circuit court of appeals for the Seventh circuit stated the rule to be that:

"Where one person has so dressed out his goods as to deceive the public into the belief that they are really the goods of another person, and so put them upon the market, to the manifest injury of that person and of the public, an action at law will lie for the deceit, and, to save a multiplicity of suits and prevent irreparable injury, equity will restrain such unfair and fraudulent competition. This rule is so well established, is so general and elastic in its application, and so consonant to the general principles of equity jurisprudence, that it would be difficult to frame a case coming fairly within its spirit and meaning in which a court of chancery will not find a way to afford the proper relief."

Under the doctrine of these authorities, the question is not whether, technically, the word "American" can be appropriated as a trade-mark, but it is whether it appears that the complainant has built up a business in Iowa and the adjacent states, in the sale of its commodities known to the trade and the public under the brands "American Wash Blue" and "American Ball Blue," and that it is shown that the defendants are endeavoring to introduce into the same market goods of another manufacturer, by representing that they are the articles which have become known under the brands used by complainant. But it is argued with much earnestness by defendants that the style of the package and the labels thereon used by defendants do not so closely represent those used by complainant that any one could be deceived thereby. The deceit lies, not in the form and color of the packages, but in the fact that the packages all bear thereon the name or brand "American Ball Blue" and the defendants, in their letter and circulars, assert that they are the manufacturers of American Wash Blue and American Ball Blue, and are the owners of these brands. This is an assertion to the trade and to the public that they are furnishing the commodities known by these names, which is not true in fact, and the evidence clearly shows that this action on part of defendants has injuriously affected the business of complainant.

It is further contended that the complainant is not entitled to the favorable consideration of the court, because it is alleged that the complainant is engaged in selling bluing of its own manufacture under the titles of Germania and Bavarian Blues; that this is a fraud upon the public, in that these blues thus sold are not a foreign product, and therefore the complainant does not come into court with clean hands. It is not shown that the complainant advertised the articles sold under the names of Germania and Bavarian Blues as being in fact of foreign make, any further than that such might be the inference from the use of the words "Germania" and "Bavarian." The defendants have introduced in evidence boxes of the bluing put up by complainant under the names "Germania" and "Bavarian." On the face of the one box are the words "Germania Ultramarine Blue," and on the sides are the words "American Ultramarine Blue," and "None genuine without our signature. The Heller & Merz Co." On the face of the other box are the words "Bavarian Ultramarine Blue," and across these

words, in red ink, is printed the words "None genuine without name. The Heller & Merz Co., New York." Upon the ends of the box is a label containing the words "American Ultramarine Works." Under these circumstances, the evidence would not justify the court in holding that it was proven that the complainant was representing to the public that the bluing put upon the market by it under the names "Germania" and "Bavarian" were of foreign manufacture; but, if that were true, the complainant is not seeking protection for its business in selling Germania or Bavarian Blues. It asks the aid of the court to protect it against unfair competition in the business of selling the commodities known under the names of "American Wash Blue" and "American Ball Blue," and it is not claimed that it has committed any fraud upon the public in connection with this business, and therefore it is not a case for the application of the rule invoked by defendants.

Without further extending this opinion, the court finds and holds that the complainant has a valuable right in the business of selling its own products known to the trade and public by the names of "American Wash Blue" and "American Ball Blue"; that the defendants are not the owners of these names or brands, and are not the manufacturers of the articles described by these brands, and that their efforts to introduce and sell upon the market products of another manufacturer, under the representation that they are American Ball Blue or American Wash Blue, come within the definition of unfair competition, which, if permitted, would deceive the public. and injuriously affect the legitimate business of complainant; and therefore the complainant is entitled to an injunction, as prayed for, restraining the defendants from infringing upon the rights of the complainant.