No. 24,732.

THOMAS BROOKS, *Appellee*, v. P. J. WEIK and P. F. DOBSON, *Appellants.*

SYLLABUS BY THE COURT.

1. PLEADINGS—*No Confusion of Theories in Petition—Petition States Good Cause of Action.* The petition examined, and held not to violate the rule that it must be framed upon a definite theory, and that upon such theory the facts alleged must state a good cause of action.

2. EQUITABLE RELIEF—*Doctrine of Clean Hands—Wrong of Complainant—Barring Relief Must Relate to Equity Sued For.* It is not every willful and reprehensible act that will preclude a litigant in a court of equity from obtaining relief prayed, but such conduct, under the principle involved in this maxim, must bear an immediate relation to the subject-matter of the suit and in some measure affect the equitable relations subsisting between the parties to the litigation and arising out of the transaction.

3. SAME—*Right of Recovery—Evidence.* The evidence examined and no conduct of plaintiff shown which would preclude his right of recovery.

Appeal from Riley district court; FRED R. SMITH, judge. Opinion filed October 6, 1923. Affirmed.

Brooks v. Weik.

*R. P. Evans, George Clammer,* both of Manhattan, *J. V. Humphrey,* and *A. S. Humphrey,* both of Junction City, for the appellants.

*Hal E. Harlan* and *A. M. Johnston,* both of Manhattan, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: The action was for rescission of a contract to convey real estate. Plaintiff prevailed, and the defendants appeal. The history of the case is told by the trial court's findings of fact, which are substantially as follows:

1. The plaintiff, Thomas Brooks, was a farmer living near Manhattan, Kan. The defendants, P. J. Weik and P. F. Dodson, were copartners engaged in the real-estate business in Manhattan.

2. In the latter part of the summer or early fall of 1918, the plaintiff listed Lots 349 and 350 in Ward One in the city of Manhattan with the defendants for sale or exchange at the price of $50,000, agreeing to pay the defendants the usual and customary commission for their services as agents in the event that a sale or exchange was effected through the efforts of the defendants.

3. The usual and customary commission of real-estate agents in and about the city of Manhattan for services performed as agents in the sale or exchange of real estate is 2½ per cent of the sale price of the property disposed of.

4. There is located on said lots a two-story brick building known as the Barber Building, which was of the reasonable value of $50,000. The building was at all times, since December, 1919, occupied by various tenants.

5. That, pursuant to the employment by plaintiff of the defendants, as his agents in the sale or exchange of said lots, plaintiff had numerous conversations with the defendants relative to prospective purchases and exchanges for said building. That, in the fall of 1918, pursuant to the employment of the defendant, Weik proposed to the plaintiff that he trade said building for a farm owned by one Nicholson. That thereafter said defendant submitted to the plaintiff a proposition of trading said Barber building for a ranch in the state of Nebraska. That no sale or exchange resulted from such negotiations.

6. That plaintiff and defendants had been acquainted for many years prior to November, 1919, and during said time plaintiff had employed the defendants to act as his agents in effecting sales, as well as the disposition for the plaintiff of real estate on several occasions prior to the listing of the real estate and the employment of the defendants herein. That the plaintiff was a close personal friend of the defendant Weik and placed particular confidence and trust in said Weik and relied to a greater or lesser extent upon the judgment of said Weik in negotiations leading up to and culminating in the sales and exchange of real estate theretofore listed with said defendants for sale or exchange, and placed particular confidence and trust in said Weik and both defendants, and relied upon their judgment, in the negotiations leading up to, and culminating in the exchange of the Barber building for certain oil leases covering land located in the state of Texas, and hereinafter mentioned.

7. That after plaintiff employed the defendants as his agents in the fall of 1918, to effect a sale or exchange of the Barber building for the plaintiff,

that plaintiff never at any time discharged said agents, nor did the defendants ever cancel such listing or withdraw as agents of the plaintiff.

8. That, in the month of November, 1919, the defendant herein proposed · to plaintiff that he, the plaintiff, should trade said Barber building for a large block of oil and gas leases in the state of Texas, and representing to plaintiff that one O. M. Connet was then and there the owner of 30,000 acres of oil leases covering lands located in the counties of Mason and Llano, in the state of Texas. That plaintiff and defendants had numerous conversations during the months of November and December, 1919, relative to the proposed trade, and had numerous conversations with O. M. Connet, during all of which time the plaintiff understood and believed that the defendants were acting as his agents. That the plaintiff was wholly unacquainted with the location of said oil and gas leases and the nature and extent of development, if any, near said leases, and was wholly unacquainted with the value of the same. That plaintiff, during the negotiations, expressed a desire to go to the state of Texas for the purpose of making an investigation of said leases, but was advised by the defendants herein that said O. M. Connet had another prospective purchaser for said leases, and would not wait for the plaintiff to make a trip to Texas, and represented to plaintiff that plaintiff could rely upon the statements and representations made concerning said leases, and that plaintiff would find everything to be as represented.

9. That the defendants and O. M. Connet represented fraudulently to the plaintiff that said 30,000 acres of leases were in a solid block, approximately square, that there was a well drilling within four or five miles of these leases, and that said leases were of the actual value of $1.50 or $2 per acre.

10. That defendants represented to plaintiff that they had secured a proposition from O. M. Connet to the effect that said Connet would trade the plaintiff said 30,000 acres of leases for the Barber building and $10,000 in cash. That thereupon, the plaintiff becoming interested in such sale and exchange of his real estate for the Texas oil leases, instructed and advised the defendants, as his agents, to confer with said O. M. Connet and secure, if possible, a better trade for the plaintiff, and also instructed the defendants to offer said O. M. Connet a counter-proposition, of the Barber building and $5,000· for the leases. That after plaintiff had made such offer of the exchange of his property for the oil leases, the defendants reported back to the plaintiff that said O. M. Connet would not accept the counter-proposition, made by plaintiff; whereupon plaintiff instructed and advised the defendants as his agents to raise the offer to $7,500 cash difference. That thereafter, defendants advised plaintiff that they had so advised the said O. M. Connet, and said Connet would not take less than $10,000 in addition to the Barber building for his said leases. That the negotiations herein mentioned covered a period of two or three weeks, and finally resulted in the execution of a written contract, dated December 24, 1919, between the plaintiff as one of the parties, and the said O. M. Connet as the other party, in which contract plaintiff agreed to convey said Barber building and execute his promissory notes aggregating $10,000 to the said O. M. Connet, in exchange for 30,000 acres of oil and gas leases covering lands located in Mason and Llano counties, Texas. That immediately upon the signing and execution of said written

contract, the plaintiff made, executed and delivered his promissory notes, payable to the order of said O. M. Connet, two in the sum of $2,500 each, one in the sum of $5,000.

11. That the Barber building was encumbered by a mortgage indebtedness in the aggregate amount of $30,000.

12. That on the 18th day of January, 1920, the defendant, pursuant to the agreement made and entered into by and between the plaintiff and said O. M. Connet, delivered to plaintiff oil and gas leases covering something over 30,000 acres of land in Mason and Llano counties, Texas, and on January 30, 1920, plaintiff and his wife, Ida R. Brooks, made, executed and delivered to O. M. Connet, lots 349 and 350 in Ward One, in the city of Manhattan, Riley county, Kansas, for an express consideration of $50,000, subject to mortgage liens aggregating $30,000.

13. That on or about the first week in January, 1920, the defendant, P. J. Weik, sold and rediscounted the $5,000 note of plaintiff, made, executed and delivered to O. M. Connet, on the 24th day of December, 1919, to the Farmers State Bank of Clay Center, Kan., and received in exchange therefor United States Liberty Loan Bonds of the par value of $5,000 and on or about the same date, said P. J. Weik sold and rediscounted one of the $2,500 notes made, executed and delivered by the plaintiff on the 24th day of December, 1919, to O. M. Connet, to the Leonardville State Bank of Leonardville, Kan., receiving therefor the sum of $2,400. That in the latter part of February, 1920, the defendant, P. J. Weik, sold and rediscounted the other $2,500 note made, executed and delivered by the plaintiff to O. M. Connet on the 24th day of December, 1919, to one Bert Walters, receiving therefor the sum of $2,400; all of which said bonds and moneys received for said notes were kept and retained by said defendants and O. M. Connet.

14. That in the months of November and December, 1919, and on the 24th day of December, 1919, the said Connet was not, in fact, the owner of said 30,000 acres of oil and gas leases, as represented by said defendants and said Connet, and that early in the month of January, 1920, and after the execution of the contract between plaintiff and Connet, the said Connet went to San Antonio, Texas, pursuant to the plans of the defendants and said Connet for the purpose of securing the leases, covered by said contract with the plaintiff, and that on January 6, 1920, contracted for oil and gas leases and assignments thereto in blank; covering about 30,320 acres of land in Mason and Llano counties, Texas; that the said Connet paid, as part payment on said leases $1,000 which the said Connet received from the defendant Weik by telegraph. That the said Connet directed H. J. McMullen, from whom he purchased said leases, to forward the said leases and assignments to the First State Bank of McFarland, Kan., with a sight draft attached for $5,888.92, with directions to deliver the leases to Connet or whomever he might direct on payment of the said draft in the sum of $5,888.92.

15. That the total purchase price of said 30,320 acres of oil and gas leases in Mason and Llano counties, Texas, was the sum of $6,888.92.

16. That P. J. Weik paid the draft attached to said leases with a draft drawn on the Union National Bank of Manhattan, in the sum of $5,888.92 and received the oil and gas leases and assignments thereof.

17. That at all times during the negotiations leading up to, and the final consummation of the sale and exchange of plaintiff's real estate and execution of the notes by the plaintiff for the 30,000 acres of oil and gas leases, that the defendants Weik and Dobson, as well as O. M. Connet, concealed from the plaintiff the fact that they were securing said oil and gas leases at a consideration of $6,888.92 and concealed from the plaintiff that they, together with O. M. Connet, were financially interested in the subject matter of their agency and concealed from him the fact that they were trading such leases to him for his real and personal property. That said Connet, while profiting alone out of the proceeds of the sale of the $10,000 of notes executed and delivered to the said Connet, was not the real party in interest in the contract for the exchange of the real and personal property of the plaintiff for the oil and gas leases and was only used by the defendants as the ostensible purchaser of the Barber building for the purpose of concealing from the plaintiff the fact that the defendants were financially interested and profiting at the expense of their principal in the exchange of the real estate and notes for the oil and gas leases.

18. That the defendants, at the time of the execution of the contract between O. M. Connet and plaintiff, and subsequently at the time of the delivery of the leases and final consummation of the exchange of the property, were fully advised of the facts in connection with the oil and gas leases in the state of Texas, and their location and price, but failed to disclose such information to their principal, and the plaintiff was wholly unacquainted with such facts at said time, and that plaintiff did not discover the facts of the duplicity of his agents, the defendants herein, until the time hereinafter stated.

19. That while it is a fact that plaintiff conveyed to O. M. Connet the Barber building as hereinbefore stated, that the said O. M. Connet received and held title thereto, not as the real owner thereof, but in trust for the defendant, P. J. Weik, who was, in fact, the real party in interest.

20. That the notes executed by the plaintiff as above found in the principal sum of $10,000 were, at the time of their execution of the actual value of $10,000, and that since their execution the plaintiff has paid two of said notes in the principal sum of $7,500, and that the third note in the sum of $2,500, is now in the hands of an innocent holder for value.

21. That the oil and gas leases in Mason and Llano counties, Texas, which defendants and O. M. Connet traded to the plaintiff for his equity in the real estate above described and the $10,000 in notes, was of the reasonable market value, at the time of the consummation of said deal, of $6,888.92.

22. That for the purpose of deceiving the plaintiff into believing that O. M. Connet was the *bona fide* purchaser of the Barber building, and that defendants had no interest therein, the defendants caused the legal title to be vested in Connet until August ——, 1920, upon which date Connet conveyed to one William N. Williams, who, thereafter, conveyed to one N. C. Sink, who, thereafter, conveyed to J. N. Dever, who, thereafter, on December 5, 1921, conveyed to the defendant P. J. Weik. That Connet, Williams, Sink and Dever, and each of them, held the title to said real estate for the defendant P. J. Weik.

23. That the defendants at no time disclosed to plaintiff herein, but at all times concealed from plaintiff, the fact that O. M. Connet, Wm. N. Williams,

Brooks v. Weik.

N. C. Sink and J. M. Dever were not the real owners of said real estate, and that they held title thereto in trust for the defendant, P. J. Weik.

24. That the defendant, P. J. Weik, has derived all of the rents and profits from the Barker building since February, 1920, up to and including the month of September, 1922. That the rentals paid by said tenants of said building during said period of time and so derived by the said P. J. Weik, have amounted to the sum of $14,504.

. 25. That from and after February, 1920, . . . the defendants collected rents from the Barber building, in excess of bills for up-keep, water, light, heat and repairs, together with principal and interest paid upon mortgages, that have been actually paid, the total sum of $1,107.14.

26. That the first knowledge that plaintiff acquired that defendants had acquired an interest in his real estate was on December 29, 1921—the date of the deed from Dever to Weik, which knowledge was constructive only.

27. That after acquiring the Texas oil and gas leases, and up to the summer of 1921, plaintiff made various efforts to dispose of said oil and gas leases and entered into various contracts to sell the same; but never, in fact, conveyed his title to said leases to any person or persons and has never received anything of value for said leases. That all of the efforts on the part of the plaintiff to dispose of said leases were made prior to the time that plaintiff discovered that his agents, the defendants herein, had, while acting as his agents, become financially interested in and profited by the sale and exchange of said real estate and personal property for the oil and gas leases heretofore described. That said oil and gas leases, by the terms thereof, have long since expired and are now of no value whatsoever.

28. That the defendants, Weik and Dobson, and said O. M. Connet, in the purchase of said oil and gas leases, used $6,888.92 of the proceeds of the sale of plaintiff's notes in the sum of $10,000. That defendants Weik and Dobson profited, as a result of the exchange of plaintiff's real estate and $10,000 in notes, for the oil and gas leases in Mason and Llano counties, Texas, to the extent of the equity of the plaintiff in said Barber building, and the rentals thereof since the first day of February, 1920.

29. That P. J. Weik, defendant herein, now holds the record title to Lots 349.and 350 in Ward One in the city of Manhattan, Riley county, Kansas, and that no equity for or on behalf of an innocent third party or parties has attached thereto.

The court thereupon rendered judgment decreeing the plaintiff owner of the real estate and for the sum of $1,107.14, being the amount.of rentals collected by defendants after allowing all offsets to which they were entitled.

It is ably contended by the defendants that two inconsistent causes of action were stated in plaintiff's petition; that the trial court erred, first, in not requiring the plaintiff to elect upon which of the alleged causes of action he would proceed, and not requiring him to frame his petition on a single definite theory; second, that the plaintiff came into court seeking equity with unclean hands.

1. The code requires that the petition shall state the facts constituting the cause of action in ordinary and concise language and without repetition. (Civ. Code, § 92.)

In *Stewart v. Baldertson*, 10 Kan. 131, 145, it was said:

"The proposition that each and every separate and distinct fact which enters into and assists in constituting either a cause of action or a defense must have at least one separate and distinct statement has no exception in pleading. Facts cannot be classified and grouped together and then alleged in a group."

In *Grentner v. Fahrenschield*, 64 Kan. 764, 68 Pac. 619, it was said:

"The plaintiff must frame his petition upon a distinct and definite theory, and upon that theory the facts alleged must state a good cause of action. If the petition is not drawn upon a single and definite theory, or there is such a confusion of theories alleged that the court cannot determine from the general scope of the petition upon which of several theories a recovery is sought, it is insufficient." (Syl. ¶ 1.)

In the instant case the facts were alleged in detail, which necessarily required a petition of unusual length. It will be noted that in the Grentner case it was held that sufficient facts were not alleged to sustain any theory. That case was decided under the old theory of pleading which required definite tender of specific issues—a theory which no longer prevails, or, at least, has been materially modified. Ordinarily, it is enough fairly to inform the defendant what the suit is about, and even if inconsistencies appear, they are not fatal if, on any theory, the plaintiff states a cause of action. Whether or not the petition is technically good becomes less material after a full trial on the merits in which the subject of controversy has been thoroughly investigated. In the instant case the petition proceeds upon a single and definite theory: that the defendants were plaintiff's agents in the sale of the Barber building and $10,000 of his notes for 30,000 acres of oil leases in Texas; that they occupied toward him a fiduciary relationship by reason of such agency; that they violated the confidence and trust reposed in them by misrepresenting to the plaintiff the location and value of the oil leases and by withholding from him the price for which they obtained them; by conspiring with an ostensible purchaser (Connet) and by concealing from the plaintiff that defendants were, in fact, furnishing the money for the oil leases and trading them to plaintiff, their principal, thereby procuring their principal's real and personal property without his knowledge or consent. For a rescission of the contract and setting aside of the deed of conveyance, for a recovery of the

Brooks v. Weik.

proceeds of plaintiff's $10,000 in notes, and for an accounting of the rents and profits of plaintiff's building during the period that it was in the possession of defendants, the petition stated one cause of action. The plaintiff was not dealing with the defendants as the purchasers of his property. Presumably they were acting for him. He was not dealing with them at arm's length. The circumstances were different from the ordinary case where a sale occurs between a vendor and vendee. Here the sale was induced to an ostensible vendee who, as a matter of fact, took and held the property for the vendor's agents. It was competent for the plaintiff to allege every scheme and fraudulent device used by defendants in their dereliction of duty toward him and the procuring of his property for themselves. (See, *Hospital Co. v. Philippi*, 82 Kan. 64, 107 Pac. 530; *Bank v. Woodrum*, 60 Kan. 34, 55 Pac. 330; *Tire Co. v. Kirk*, 102 Kan. 418, 170 Pac. 811; *Railroad v. Powers*, 14 Fed. 77, 2 C. J. 697.) In attempting to allege all of the facts constituting his cause of action, plaintiff perhaps unnecessarily repeated certain statements. These repetitions, however, cannot be said to have affected the substantial rights of the defendants, and the refusal of the trial court to sustain defendants' motions or demurrer was not reversible error. (Civ. Code, § 141.)

2. The defendants insist that plaintiff came into court seeking equity with unclean hands; that he purchased the leases in question to sell at advanced prices and for promotion purposes, and because of such purposes, he is precluded from recovering his property from defendants; that he is barred by that principle of equity which requires a litigant, seeking equity, to come into court with clean hands. The defendants rely on the case of *Primeau v. Granfield*, 193 Fed. 911. There the parties to the suit were associated in a joint enterprise to sell worthless stock to the public. The action was based upon the unlawful agreement between them. The court held that the parties were engaged in a joint fraudulent undertaking. The court said (p. 916):

"The wrongdoing which will defeat a litigant must have connection with the matter in litigation. Misconduct in outside matters will not have such effect. . . . The real test in such a case as this is whether the plaintiff requires any aid from the fraudulent transactions to establish his demand. If he does he cannot recover. If he does not and the cause of action is unconnected with the fraudulent undertaking and is founded upon a collateral consideration he may recover."

Here the trial court found that "The plaintiff made various ef-

forts to dispose of the oil and gas leases and entered into various contracts to sell them but never, in fact, conveyed his title to said leases to any person and never received anything of value for them." The fact that plaintiff made efforts to sell the leases is no defense to this action. The subject matter of this suit has no relation to the attempts of the plaintiff to dispose of the leases. The plaintiff strenuously denies any inequitable conduct in his attempts to sell them, but even if his efforts in such regard were attended with bad conduct, such fact could not be urged by the defendants as a bar to his right of recovery here.

In 4 A. L. R. 65, is found an extensive note covering the topic under consideration. It is there said:

"The decisions are in accord in holding that it is not every wilful and reprehensible act that will preclude a litigant in a court of equity from obtaining the relief prayed, but such conduct, under the principle involved in this maxim, must bear an immediate relation to the subject-matter of the suit, and in some measure affect the equitable relations subsisting between the parties to the litigation and arising out of the transaction." (See, also, *Greer v. Payne,* 4 Kan. App. 153, 162, *Shaver v. Heller & M. Co.,* 108 Fed. 834, 65 L. R. A. 878, 48 C. C. A. 48, affirming 102 Fed. 882; *Trice v. Comstock,* 121 Fed. 620, 61 L. R. A. 176, 57 C. C. A. 646; *Foster v. Winchester,* 92 Ala. 497, 9 So. 83; *Bradley Co. v. Bradley,* 165 Cal. 237, 131 Pac. 750; *Kirby v. Union P. R. Co.,* 51 Colo. 509, 119 Pac. 1042, Ann. Cas. 1913 B, 461; *Yale Gas Stove Co. v. Wilcox,* 64 Conn. 101, 25 L. R. A. 90, 42 Am. St. Rep. 159, 29 Atl. 303; *Williams v. Beatty,* 139 Mo. App. 175, 122 S. W. 323, 21 C. J. 187.)

In *Talbot v. Independent Order of Owls,* 136 C. C. A. 268, 270, 220 Fed. 660, the court said:

"Nor does the evidence which is found in this record upon which the defendants rely to defeat the plaintiffs, and to bring this suit under the ban of the principle, 'He who comes into equity must come with clean hands,' sustain that defense. That principle does not repel all sinners from the precincts of courts of equity, nor does it disqualify any plaintiff from obtaining full relief there who has not done iniquity in the very transaction concerning which he complains. The wrong which may be invoked to defeat him must have an immediate and necessary relation to the equity for the enforcement of which he prays."

In *Miller & Lux v. Enterprise, etc., Co.,* 142 Cal. 208, 100 Am. St. Rep. 115, 75 Pac. 770, it was said:

"The contention of respondents rests on certain maxims, as that 'No one acquires a right of action from his own wrong,' 'Out of a base transaction a cause of action does not arise,' 'He who comes into equity must come with clean hands,' etc. But these maxims have their limitations, and will not be allowed to work a great injustice and wrong when the alleged unlawful act is

entirely unconnected with any transaction between the parties to the suit. Usually these maxims cannot be successfully invoked where the objectionable act in no way affects the equitable relations existing between the parties." (p. 213.)

In *Carr v. Craig*, 138 Iowa, 526, 116 N. W. 720, it was said:

"The equitable rule that a plaintiff asking relief must come into equity with clean hands has reference only to the relations between the parties, and arising out of the transaction. 'It does not extend to any misconduct, however gross, which is unconnected with the matter in litigation, and with which the opposite party has no concern'." (p. 532.)

The facts in this case abundantly support the judgment. It is therefore affirmed.