No. 47,502

Mary M. Benton, *Appellant,* v. A. Eugene Benton, *Appellee.*

(528 P. 2d 1244)

Opinion filed December 7, 1974.

*Donald E. Shultz,* of Shultz and Shultz, Chartered, of Dodge City, argued the cause and was on the brief for the appellant.

*J. Stephen Nyswonger,* of Braun and Nyswonger, of Garden City, argued the cause, and *Lelyn J. Braun,* of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

Foth, C.: This action was commenced as one to quiet title to a quarter section of land in Gray county. The trial court found that plaintiff was not the absolute owner of the land, but instead was the mortgagee under an equitable mortgage. It gave her judgment for the underlying debt and strictly foreclosed the mortgage, but also gave the defendant mortgagor a forty-five day redemption period. In so doing the court refused to give any effect to a quitclaim deed from defendant to plaintiff, holding it to be a sham. Plaintiff appeals, contending the court erred in granting the period

of redemption, and in refusing to quiet her title under the quit-claim deed.

The plaintiff, Mrs. Mary M. Benton, is grandmother of the defendant A. Eugene (Gene) Benton. In 1968 Mrs. Benton and her now deceased husband were the owners of the quarter in question. They agreed to sell it to their grandson for a sum found by the court to be $10,000, payable at $600 per year, with interest at 6%. Gene was just turning eighteen and facing the draft, so a warranty deed was executed on April 1, 1968. It was recorded August 21, 1968, about the time Gene judicially acquired the rights of majority. The balance of the parties' agreement was never reduced to writing, but both parties, while differing over some of its terms, recognize its existence.

The defendant promptly entered into possession of the land and commenced to farm it. The first thing he did was sink an irrigation well, financed by the proceeds of a $25,000 mortgage to Travelers Insurance Company dated October 10, 1968. He then planted the land to alfalfa.

The first and only $600 payment on the place was made the following summer, on August 22, 1969. By October, 1969, Gene was back to his grandmother borrowing $1800 "until I sell my alfalfa." (This sum, together with various other advances from plaintiff to defendant over the next four years, was added to the balance of the original debt in arriving at the court's judgment for plaintiff. At oral argument we were advised by both counsel that the parties have agreed upon an accounting between them and have stipulated as to the amount required for redemption should we determine that redemption is proper.)

It appears that the defendant commenced his farming operation in some sort of association with one Doc Addison. By the spring of 1970 the two had had a falling out, and Doc was threatening to sue. He was claiming a partnership with Gene, and a one-half ownership of the quarter section; it was he who had made the $600 payment of the preceding summer. At this point Gene executed the quitclaim deed upon which plaintiff rests her present claim to title. Gene testified that he consulted a lawyer about his difficulties with Doc, and as a result of that consultation conceived the idea of the deed as a device to place the quarter beyond Doc's toils in the threatened litigation. Accordingly, he testified, he went to his grandmother on the evening of June 23, 1970, and gave her the deed. He explained at that time, he said, that Doc was

threatening to sue him. He promised to take care of the payments on the Travelers mortgage, and would get a deed back from her when his trouble with Doc was settled.

Gene's version of this meeting was corroborated by the testimony of Terry Nolan, a farmer who had done contract harvesting for Gene and had money coming. Nolan described not only the legal consultation but also the meeting between Gene and his grandmother. He was present, he said, heard Gene explain why he was giving Mrs. Benton the deed and that he would expect one back when the trouble with Doc blew over, and heard her respond, "Fine."

The plaintiff's version of the meeting was a little different. Only she and Gene were present, she said, and Gene never did explain to her why he was giving her the deed. She thought it was because she had been nagging him about needing some money from the place. She did testify, however, that when Gene brought her the deed he told her Doc was suing him but hadn't filed yet, and that she should get the deed down to the courthouse and record it at 8:00 o'clock in the morning. This she did, on June 24, 1970.

Gene continued to farm the land, along with considerable other land owned by plaintiff, until January 29, 1973. At that time she orally dispossessed him and turned the farming of all her land over to his brother-in-law. Plaintiff admitted that at Easter time of 1972 Gene had asked her to reconvey, saying that "he was going to have to have the deed back." Her version of her response does not appear in the record, but according to Gene, "She said that if the lawsuit was still pending that she didn't feel that she could go through with the deeding it back."

Doc's lawsuit, which had been filed in November, 1970, *was* still pending at Easter of 1972. It was dismissed a year later (on April 2, 1973) because, according to Doc, "you can't get blood out of a turnip." A month later, May 11, 1973, Mrs. Benton filed this suit claiming absolute ownership.

On appeal plaintiff contends: first, that the dealings between the parties afforded ample consideration for an absolute deed from Gene to plaintiff; second, that there was no consideration for any promise on her part to reconvey; third, that such an agreement can't be enforced in equity because it was in fraud of creditors; and fourth, that Gene in particular can't enforce any such agreement because he comes into equity without the requisite clean hands.

(Her fifth contention, dealing with interest on various advances, we take to be settled by the stipulation of the parties as to the redemption amount, referred to above.)

We think plaintiff has misconceived the import of the trial court's findings, and the contentions just enumerated thus miss the mark. As to the quitclaim deed the court's only findings were:

"f. That when A. Eugene Benton deeded the property back to Mary M. Benton, his grandmother, it was intended as a sham transaction for the purpose of putting the property beyond the reach of his prospective creditors.

"g. That such deed and its delivery did not actually convey title to Mary M. Benton."

These findings are clearly supported by the testimony described above. Having made them, the trial court was justified in its course of paying no further attention to the deed. It made no difference that there might have been consideration for a bona fide deed—this one was a sham, intended to convey nothing.

Further, the trial court did not enforce any agreement to reconvey. Therefore it mattered not whether there was consideration for such an agreement, whether it was tainted by the parties' fraudulent intent, or whether Gene was barred from enforcing it because of his unclean hands. That the court's judgment was wholly independent of the existence or validity of the deed-and-agreement-to-reconvey is clear from its findings:

"c. I find that the original sale of the land to him [Gene] was for $10,-000.00 at 6% interest.

"d. That a mortgage and note evidencing this was to be provided or at least some contract evidencing this debt was to have been provided.

"e. That *as a result of the transaction*, Mrs. Benton became the owner of an equitable mortgage in the original amount of $10,000.00 with interest at 6% from April 1, 1968." (Emphasis added.)

The finding of an equitable mortgage, then, was based entirely on the original, incomplete transaction of 1968. A loan made on the faith of an unfulfilled agreement to execute a formal mortgage on identifiable property gives rise to a classic species of equitable mortgage. *Hill v. Hill*, 185 Kan. 389, 345 P. 2d 1015; *Rex v. Warner*, 183 Kan. 763, 332 P. 2d 572, and cases cited. Cf. also, *Union National Bank & Trust Co. v. Acker*, 213 Kan. 491, 516 P. 2d 999, and cases cited.

What, then, was the proper remedy? The trial court had found, on virtually undisputed evidence, an equitable mortgage dating from 1968. Defendant mortgagor was in default; plaintiff mortgagee

was in possession and entitled to foreclose. Neither party contends that, if that were all, strict foreclosure with a forty-five day redemption period would not have been a proper decree. See, *e. g., Sutor v. First Nat'l. Bank,* 146 Kan. 52, 69 P. 2d 315; *Bankers Mortgage Co. v. O'Donovan,* 137 Kan. 309, 20 P. 2d 809. The fact that plaintiff prayed for different equitable relief, *i. e.,* that her title be quieted, did not bar the trial court from rendering the equitable relief justified by the evidence. *Kline v. Orebaugh,* 214 Kan. 207, 519 P. 2d 691.

What effect, if any, should the 1970 deed and agreement have? As to it, neither party had clean hands—plaintiff's agreement to reconvey, express or implicit, made her a party to defendant's fraudulent scheme. While defendant may not enforce the agreement to reconvey, neither may plaintiff obtain the affirmative relief she sought, *based on the deed.* Compare *Wyatt v. Collins,* 105 Kan. 182, 180 Pac. 789, where a plaintiff also unsuccessfully sought to quiet title obtained through a fraudulent deed. There the defendants claimed through the fraudulent grantor, an ancestor named Dr. Gregg. We said:

"The plaintiff is in the predicament of attempting to use a two-edged sword, which cuts both ways and applies to her as well as to the defendants. It is true that the defendants and the plaintiff are, in a sense, equally bound by reason of the fraud of Dr. Gregg; but all the court determined is that the plaintiff cannot recover, because of her own participation in the fraud. The defendants recover nothing but their costs; they gain no advantage by reason of the fraud of their ancestors, and their situation remains just what it was when plaintiff brought her suit." (p. 186.)

So here, insofar as the deed was concerned, the trial court quite properly left the parties where it found them. However, the fraud of 1970 had no effect on and was separate and apart from the transaction of 1968. Unclean hands in a matter collateral to the subject matter of the litigation will not necessarily preclude a litigant from obtaining equitable relief. Cf. *Brooks v. Weik,* 114 Kan. 402, 219 Pac. 528. The trial court therefore properly decreed foreclosure of the equitable mortgage.

The judgment is affirmed.

APPROVED BY THE COURT.