Leinbach v. Dyatt.

---

No. 25,478.

C. A. Leinbach, *Appellee,* v. Andrew Dyatt, deceased (revived against Edwin Burnap, Administrator), and Mrs. Andrew Dyatt, *Appellants.*

No. 25,479.

Andrew Dyatt (revived in the name of Edwin Burnap, Administrator, etc.), *Appellant,* v. Jesse L. Teeters, Sheriff, etc., and C. A. Leinbach, *Appellees.*

SYLLABUS BY THE COURT.

Fraudulent Conveyances—*Fraudulent Purchaser of Property When Deprived of Its Possession, Cannot Recover for Improvements Made or Mortgages or Other Incumbrances Paid While in Unlawful Possession—Nor Is He Entitled to Subrogation as a Mortgagee in Possession.* Where title to property was conveyed and possession was delivered to a grantee for the fraudulent purpose of depriving a third party of his rights thereto, and where the third party thereafter obtained judgment decreeing that the conveyance was fraudulent as against him and finding that the grantee had been an active participant in such fraud, and decreeing that the property should be sold subject to an outstanding mortgage to satisfy the just claim of the third party plaintiff, the fact that the grantee after having obtained title and possession paid a large sum of money in reduction and renewal of such mortgage covering the lands involved and other lands of the grantor, which mortgage had been foreclosed and the property sold and bought in by the mortgagee, with only the right of redemption remaining in the mortgagor, which right nominally passed to the grantee as a part of the fraudulent conveyance, and the further fact that the grantee had paid interest on such renewed and reduced mortgage and had paid taxes on the land following his fraudulent acquisition of title and possession—neither of these facts nor all of them together entitle the grantee to invoke the equitable doctrine

of subrogation for any moneys so paid by him, nor is he entitled to equitable consideration as a mortgagee in possession.

Appeals from Sherman district court; CHARLES I. SPARKS, judge. Opinion filed December 6, 1924. Affirmed.

*George D. Freeze,* of Goodland, and *Fred Robertson,* of Kansas City, for the appellants.

*A. M. Harvey, Frank Doster,* and *J. E. Addington,* all of Topeka, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: These appeals are a sequel to *Leinbach v. Dyatt,* 112 Kan. 782, 212 Pac. 894, some features of which must be rehearsed to get a clear understanding of the matters now presented.

On and before the beginning of the year 1919, J. B. Dyatt owned some 16,000 acres of land in Sherman county. The property was incumbered by a mortgage held by the North American Insurance Company for $125,000 or more, on which Dyatt had made default. The mortgagee brought suit in the federal court to foreclose, and on January 10, 1919, a decree was entered ordering some 10,640 acres of the Dyatt lands sold to satisfy the judgment. On March 8, 1919, these lands were bought in by the judgment creditor at the execution sale. As Dyatt had eighteen months in which to redeem, he set about the project of selling these and other lands, and on April 2, 1919, entered into an exclusive agency contract with the plaintiff, C. A. Leinbach, in which the latter agreed to conduct an auction sale of the lands. The contract stipulated that Leinbach should have 10 per cent of the sale price of all lands sold; terms of sale were to be 25 per cent in cash, balance on time. Lands were to be delivered to purchasers free of all incumbrances.

Pursuant to this contract, Leinbach advertised the lands and employed an auctioneer to sell them. Andrew Dyatt, a brother of the owner, acted as clerk of the sale. Some 13,280 acres were sold for an aggregate amount of $292,000. With the consent of J. B. Dyatt, and with the knowledge of Andrew Dyatt, Leinbach himself purchased 2,880 acres of these lands at $35 per acre, or $100,800. A dispute arose over the exact amount due Leinbach as commission, but this was settled by Leinbach and Dyatt, it being agreed that Dyatt should pay Leinbach $2,000 in cash and give him credit for $25,200 as the equivalent of the 25 per cent cash requirement on the lands purchased by Leinbach. Accordingly on May 9, 1919, four days

after the auction, a contract of sale was executed by Leinbach and J. B. Dyatt acknowledging Leinbach's payment of $25,200 and obligating Dyatt to convey the lands (2,880 acres) by deed of general warranty to Leinbach, and to accept a ten-years' note and mortgage on the property for $75,600 from Leinbach as the balance of the purchase price. It was also stipulated that possession was to be given within two weeks from the date of the contract, May 9, 1919. Andrew Dyatt knew of this contract and was apprised of its terms, yet he entered into a fraudulent agreement with his brother, J. B. Dyatt, to deprive Leinbach of the benefits of his contract of purchase; and to accomplish that purpose Andrew Dyatt on May 19, 1919, took a conveyance from J. B. Dyatt of the lands involved herein and also the other lands covered by the decree of foreclosure and sale in the federal court. After Andrew Dyatt obtained a conveyance of the land from his brother he effected some sort of a bargain with the North American Insurance Company about August 15, 1919, whereby the proceedings in the federal court were set aside (this fact has to be inferred) and Andrew Dyatt paid $50,000 (so alleged, and conceded by demurrer) on the original mortgage indebtedness covering the Dyatt lands in controversy and other lands and gave his own note and mortgage for $90,000 as a renewal of the remainder of the original indebtedness of J. B. Dyatt to the insurance company.

The foregoing covers the principal matters which led up to the first chapter of this litigation, which was reviewed by this court in *Leinbach v. Dyatt,* supra. That action was for specific performance of the contract for Leinbach's purchase of 2,880 acres of the Dyatt lands, or in the alternative for a money judgment. In that action Leinbach alleged that Andrew Dyatt purchased the lands with full knowledge of Leinbach's rights and with the fraudulent purpose of defeating them. Andrew Dyatt's answer was a general denial of all the allegations of fraud; and accompanying his answer he filed a cross-petition alleging that he was the unqualified owner of the lands—

"by and through a conveyance from the owner thereof, which owner had the title thereto and the exclusive possession thereof, at the time of the conveyance of the same to this defendant, that at the time this defendant became the owner of such lands, he went into and took possession of the same, that he now has the open, the adverse, the exclusive and the notorious possession of such lands, and that he and the prior owners of the same have continuously

and uninterruptedly had such possession, having and claiming title thereto, for more than twenty-five years prior hereto."

Andrew Dyatt's cross-petition continued in part:

"That the plaintiff, C. A. Leinbach, makes claims of rights to such lands, of interests therein and of liens thereon, under and by virtue of pretended contracts, . . . that this defendant is not a party to such contracts, and that he had no knowledge thereof until long after the time of their pretended execution . . .

"That the title to such lands should be quieted in this defendant against all claims of the plaintiff, and that this defendant should be adjudged the sole, the absolute and the unqualified owner of such lands, free from all of the claims of the plaintiff herein."

The trial court found:

"8. That Andrew Dyatt had knowledge of the material contents of Exhibits B and C to the petition herein before he contracted for the purchase of the lands involved in this controversy.

"9. That defendant, Andrew Dyatt, entered into a fraudulent agreement with the defendant, J. B. Dyatt, for the purpose of depriving the plaintiff herein of his rights under the terms and conditions of Exhibits B and C, attached to plaintiff's petition, and took a conveyance to the lands in question."

The trial court found and determined that specific performance could not be decreed because the existence of the mortgage on the lands contracted to Leinbach and other lands held by the insurance company rendered such relief impractical, and judgment was awarded to Leinbach for $25,200 and interest, and providing also—

"That said judgment shall be a lien upon the land described in Exhibit B, subject to the mortgage to the defendant insurance company; that said lien shall be superior to any title, lien or interest therein by any of the defendants, save and except the rights of the insurance company therein under and by virtue of their said mortgage."

After the judgment was affirmed by this court in *Leinbach v. Dyatt,* supra, Andrew Dyatt instituted further proceedings in the district court, viz.: He filed an action against the sheriff to enjoin that officer from selling the land to satisfy Leinbach's lien, and for other relief to be noted presently. This is case No. 25,479. He also filed two motions to vacate and correct the judgment in the original case, which motions were merely other methods of seeking substantially the same sort of relief prayed for in the case against the sheriff. These constitute case No. 25,478.

In his petition against the sheriff, Andrew Dyatt narrated the antecedent litigation, setting up the pleadings and judgment in *Leinbach v. Dyatt,* supra, and alleged that the judgment was void

in so far as it declared the claim of Leinbach to be superior to any lien or interest of Andrew Dyatt, and that such an adjudication was outside the issues, and that the only judgment the court could enter or intended to enter was one holding that Leinbach's claim was superior *to any title* of Andrew Dyatt.

The petition further alleged the former existence of the mortgage covering most of these and other lands of J. B. Dyatt, recited the foreclosure proceedings and sale of the lands on March 8, 1919, by decree of the federal court, and that on May 19, 1919, Andrew Dyatt received a conveyance of them, together with possession from J. B. Dyatt; and that on August 15, 1919, he paid the North American Life Insurance Company $50,000 in cash and gave it his note for $90,000 and executed a mortgage on the lands (about 10,080 acres) as security therefor. Plaintiff further alleged:

"That the rights being asserted herein arise largely by reason of the subrogation of Andrew Dyatt to the rights of said North American Life Insurance Company growing out of said mortgages. That by virtue of the payments made by Andrew Dyatt, plaintiff herein, to said North American Life Insurance Company upon the said decree obtained in the United States district court affecting all of said lands covered by said mortgage (which includes specifically all of the lands sought to be affected by said order of sale, except as aforesaid) as well as by the payments of interest upon said mortgage of $90,000, together with the payments of taxes upon said land and payments upon the said principal sum, all of which are hereinafter more specifically set forth, Andrew Dyatt has become and is subrogated to the rights of the said North American Life Insurance Company under the said first mortgage, which was foreclosed in the said suit pending in the United States district court, and that said Andrew Dyatt holds and possesses à lien against all of said lands (including specifically the lands sought to be affected by said order of sale) which lien is paramount and senior to the lien of the defendant C. A. Leinbach."

Additional recitals in the petition told of another mortgage on one quarter section of the J. B. Dyatt lands which Andrew Dyatt paid off and for which he similarly claimed rights of precedence by subrogation. Appropriate allegations were also made covering items of payment of interest and taxes, and the fifth and fourteenth amendments to the federal constitution were invoked. The prayer was for subrogation to the rights of the original mortgagee; and for an equitable allocation of the amounts paid and still to be paid on the mortgage between the lands subjected to Leinbach's lien and the other lands covered by the original mortgage; and that Andrew Dyatt should be adjudged to be rightfully in possession and to be

entitled to the rights of a mortgagee in possession, and that the sale under Leinbach's original judgment be enjoined until Leinbach should pay an equitable amount under Andrew's demand for allocation and for other appropriate relief.

A demurrer to the petition in the case against the sheriff was sustained, and the motions to vacate and correct the judgment in the original case were overruled.

Hence these appeals.

It is quite true, as counsel for Andrew Dyatt contend, that in the litigation which culminated in the judgment which was affirmed by this court in *Leinbach v. Dyatt,* supra, "the question of Andrew Dyatt's rights in these lands as a mortgagee in possession was never hinted at either by issue tendered, by argument or otherwise." Andrew Dyatt did set up his possession and asserted his right of possession by virtue of the conveyance of May 19, 1919, from his brother. His possession originated on that date and from that source. He did not acquire possession at that time by virtue of subrogation to the rights of the North American Life Insurance Company as judgment creditor or as purchaser at the foreclosure sale in the federal court or as mortgagee. We say he did not, indeed, he could not, for the excellent reason that he entered into possession on May 19, 1919, and did not acquire any rights of any sort from or through the North American Insurance Company until about August 15, 1919, when he effected some sort of a deal whereby the original mortgage —notwithstanding all that had transpired concerning it in the federal court—was apparently revived, reduced and renewed.

Appellants contend that Andrew Dyatt, notwithstanding his title was fraudulent as against Leinbach, notwithstanding he was an active participant in that fraud, and notwithstanding his fraudulent title was the only possible foundation for his being recognized by the North American Insurance Company as the holder of the option of redemption with whom it might safely deal for the rehabilitation and renewal of its foreclosed mortgage, is entitled to the rights of a mortgagee in possession. Laying aside for the moment the question whether a title holder who has acquired his title and possession by fraud can strengthen his precarious situation against the victim of his fraud by thereafter paying off mortgages, paying taxes, paying for improvements and the like, it is not clear how Andrew Dyatt can be regarded as a mortgagee of any sort in possession. The erstwhile mortgagee, the North American Life Insurance Company, in

some undisclosed way accepted a renewal of that mortgage from Andrew Dyatt as *mortgagor*. The fair deduction therefore is that Andrew Dyatt as nominal fee title owner—so far as the insurance company is concerned, at least—is not a mortgagee but the mortgagor whom the insurance company has accepted as its debtor in lieu of J. B. Dyatt and as his successor in title. As to Leinbach, however, Andrew Dyatt's title and possession, and all his claims which are necessarily based thereon, are fraudulent and void. Before possession can be given effect to strengthen a mortgagee's claim, it is essential that such possession should have been acquired in some lawful manner and without resort to means which equity cannot countenance. (*Stouffer v. Harlan*, 68 Kan. 135, 74 Pac. 610.) Leinbach's contract of purchase of the land was based on the terms of the auction sale, "land to be delivered to purchasers free of all incumbrances," and the written contract of sale between J. B. Dyatt and Leinbach, of May 9, 1919, stipulated for "possession to be given within two weeks from date hereof." Andrew Dyatt knew of those contract terms between his brother and Leinbach; and it was for the purpose of defrauding Leinbach of the benefits of that contract that the title and possession of J. B. Dyatt were transferred to Andrew Dyatt.

With these outstanding facts clearly developed, the pertinent law is not far to seek nor difficult to apply. As to conveyances procured by fraud, it is text-book doctrine that—

"The law therefore will not permit the transfer to stand as a security for the amount paid to the debtor, or for the sums subsequently paid to creditors, even though he thereby pays off a mortgage, or a debt contracted in the purchase of the property. If the property assigned consists of a contract to erect a building, he cannot claim even what he paid for labor and materials in doing the work. No allowance can be made to an assignee for his services under a fraudulent assignment, or for the sum paid to counsel after the lien of the creditors had attached." (Bump on Fraudulent Conveyances, 4th ed., p. 605.)

With reference to the futility of a payment of a mortgage by a transferee of title fraudulently obtained as a basis for subrogation or indemnity, Bump's text quoted above cites *Railroad Company v. Soutter*, 80 U. S. 517. That was a case where a group of railroad bondholders caused a fraudulent sale of a railroad to be made and bought in the property to the prejudice of other creditors. They then paid off part of the railroad's bonded indebtedness. When the sale was set aside as fraudulent, the rogues who had participated in the fraud claimed to be entitled to reimbursement through subro-

gation to the rights of the creditors whose claims they had paid. In the supreme court's opinion, Mr. Justice Bradley, speaking for a majority of the court, said:

"The bare statement of the claim, even presenting it in the language of the bill itself, seems to us sufficient to condemn it. Who are the complainants? Are they not the very bondholders, self-incorporated into a body politic, who, through their trustee and agent, effected the sale which was declared fraudulent and void, as against creditors, and made the purchase which has been set aside for that cause? Was it ever known that a fraudulent purchaser of property, when deprived of its possession, could recover for his repairs or improvements, or for incumbrances lifted by him whilst in possession? If such a case can be found in the books, we have not been referred to it. Whatever a man does to benefit an estate, under such circumstances, he does in his own wrong. He cannot get relief by coming into a court of equity. By the civil law, the possessor, even in bad faith, may have the value of his improvements, if the real owner choose to take them. The latter has an option to take them or to require their removal. But this rule has never obtained in the common law, nor in the system of English equity. One of the maxims of the latter system is, 'He that hath committed iniquity shall not have equity.' And various illustrations of it are furnished by the books." (p. 523.)

While three of the justices dissented, the majority doctrine has never been qualified by the United States supreme court, and, indeed, it has been so frequently cited and followed that it may be regarded as fundamental in American equity jurisprudence. See Rose's Notes in 20 L. Ed., appendix, pp. 698-701. To the same effect were *Wiley Bank & Co. v. Knight et al.,* 27 Ala. 336, and *Thompson v. Bickford,* 19 Minn. 17.

In *Goble v. O'Connor,* 43 Neb. 49, there was a sale in foreclosure of mortgaged real property. O'Connor induced another bidder to cease bidding, paying him $200 therefor, whereby O'Connor was enabled to buy the property at an undervalue. He thereafter paid off a tax lien for $805.43, paid $103 to redeem the property from a tax deed, paid city and county taxes in the sum of $149.85, and the further sum of $303.47 for repairs and improvements on the property. When the sale of the property to O'Connor was set aside on the ground of fraud, he demanded reimbursement for the purchase price plus the various sums paid out by him to discharge liens, incumbrances and taxes. The trial court held:

"The court further finds as a matter of law, and because of the aforesaid fraudulent acts of the defendant O'Connor at said sale, that he, the said defendant O'Connor, is not entitled in this action to be reimbursed any of the moneys he has as aforesaid expended in satisfying said decree, or in payment of taxes, or otherwise, and that he is not herein entitled to have a lien on said

Leinbach v. Dyatt.

property therefor, or any part thereof, and that the plaintiffs are not required in this action, as a condition precedent to the relief herein demanded, to in any manner refund to him any of said sums, to which conclusion of law defendant excepts." (p. 56.)

In affirming the judgment the supreme court of Nebraska said:

"The appellant, by his own fraudulent acts, has placed himself in such a position that the court can afford him no relief. All these payments were made in pursuance of, and as a part and in completion of, the sale which was made to him, and which was fraudulent as to the rights of appellees because of his wrongful acts and practices at and during such sale, and his right to be reimbursed all payments and expenditures must arise out of the sale which was tainted with his fraud and wrong, and void in consequence thereof, and his claim derived from such a source cannot be recognized in any court. To require the appellees to repay what has been paid out by appellant in this case would not be enforcing the rule that 'he who seeks equity must do equity.' 'The rule has no application to cases of actual fraud. It would be against good policy that it should; for it would act as an encouragement to unfair dealing. A man might gain, but he could not lose by his frauds. If he succeeded, he would reap the fruits of his knavery; but if detected, he would be entitled to a return of his money, and moreover to be reimbursed to the value of his improvements.' (*Gilbert v. Hoffman,* 26 Am. Dec. [Pa.] 103.) The sale to appellant was void because of his wrongful and fraudulent acts at the time of the sale, and he acquired no title as against appellees, and is not entitled to have the money paid out by him refunded; and this last, not by way of punishment, and not that the court would help or desire to aid appellees beyond the demands of justice and equity, but because, by his own wrong, the appellant has placed himself in such a position that the court is unable to grant him relief. . . . The decree of the district court is affirmed." (pp. 59-60.)

The theory of subrogation is an equitable doctrine which can only be invoked by one who comes into court with clean hands. It cannot be invoked by one who has been an actual participant in a fraud connected with the subject matter of the litigation. The case of *Loos v. Wilkinson,* 113 N. Y. 485, 4 L. R. A. 353, which at first blush may seem at variance with the authorities cited above, was a case where an accounting for rents and profits was demanded from a grantee of a fraudulent conveyance in which fraud the grantee, Wilkinson, was a party. The fraudulent grantee was allowed to offset his outlays for taxes, repairs, and for interest in outstanding mortgages. The doctrine of *Railroad Co. v. Soutter,* supra, *Thompson v. Bickford,* supra, and kindred cases had been invoked against any such offset or deduction because Wilkinson had been an active and guilty participant in the fraud. While ruling against this contention, the court said:

"We have carefully examined these authorities, and they furnish very little, if any, countenance for the contention of the plaintiffs. They are all cases where the fraudulent grantee was asking for the active interference of some court for his protection, or for his reimbursement for improvements, for moneys paid in pursuance of the fraudulent arrangement with his grantor, or to discharge incumbrances, or to secure to him the payment of a debt due to him from the fraudulent grantor, or where he was compelled to account for profits which he had actually made, or could have made, out of the property fraudulently conveyed; and the equitable rule was enforced that 'he who hath committed iniquity shall not have equity,' which is merely another way for saying 'that one who comes into a court of equity seeking its aid must come with clean hands.' But in none of them was the question really involved or discussed with which we are now dealing, with the possible exception of three cases to which we now call attention. . . .

"In *Thompson v. Bickford,* the court said: 'In equity, a conveyance set aside as constructively fraudulent is upheld, in favor of one not guilty of actual fraud, to the extent of the actual consideration, and is vacated only as to the excess. But if there be actual fraud there is no difference between law and equity. The conveyance is considered as void *ab initio,* and set aside entirely, and cannot stand as security to the fraudulent grantee. It is the same thing as if no deed had ever been executed.'

"In the head-note it is stated that the rents and profits and the proceeds of the parcel of land sold were liable to the same extent as the land, and that the grantee was accountable for them to the grantor's creditors, without deduction for his demands, or for money paid for taxes, or to extinguish liens or incumbrances placed thereon by the grantor. . . . So far as it was held that the fraudulent grantee could not claim reimbursement for the liens or incumbrances paid, or that he could not have satisfaction of the indebtedness from the fraudulent grantor to him, it was simply an enforcement of the general rule in harmony with all the other cases." (pp. 492, 493.)

In *Roller Mills v. Ward,* 6 N. D. 317, Ward and Hall conveyed some 1,320 acres of land to Patterson in fraud of their creditors, in which fraud Patterson was an active participant. Paulson, a creditor, attacked the conveyance as fraudulent and it was so declared. Patterson, the grantee of the fraudulent conveyance, purchased Paulson's judgment. He then paid off liens and incumbrances amounting to $15,000. Then other judgment creditors levied executions on the lands as the property of Ward and Hall. Patterson claimed rights of subrogation. As to the judgment which he had purchased from Paulson, his claim to subrogation was allowed, since it was not connected with the original fraud; but as to the mortgages it was held that he was not entitled to subrogation. The case is so instructive and convincing that we take space to quote from it at some length:

Leinbach v. Dyatt.

"At the time of the transfer of the lands to Patterson, and as a part of the transaction, Patterson assumed, by parol, and promised to pay, pre-existing liens and encumbrances against the land, amounting to about $15,000. Upon these claims Patterson has paid, in principal and interest, large sums of money, and he also paid the taxes for one year. Since all these claims so paid were prior and superior to the claims of any and all of these plaintiffs, and since, if not paid by Patterson, plaintiffs would have been forced to pay them before they could realize anything upon their own claims, out of the transferred property, it is urged that these payments by Patterson worked no wrong upon or injury to plaintiffs, and that Patterson should be subrogated to the rights of the parties whose claims he has paid, and that his conveyance should be held good as a mortgage to that extent at least, and that if a decree be entered for the sale of the lands, as was done by the trial court, such decree should provide that the amounts so paid by Patterson in extinguishment of superior liens be first repaid to him from the proceeds of such sale. Viewed from the standpoint of plaintiffs' right alone, there is great, almost irresistible, plausibility in this contention. To require that the amount of the liens subsequently paid by Patterson be first repaid to him from the proceeds of the property would leave plaintiffs in exactly the same position as to those claims that they would have held had the fraudulent transfer never been made. It is clear that plaintiffs have no persuasive equities to oppose this contention of the defendant Patterson. But there are other principles of law almost universally recognized by the courts, which must be considered in any adjudication upon the rights of the defendant.

"It must be borne in mind that this is a case of actual fraud, a case where the grantee Patterson actively aided the grantors, the Wards and Hall, in their design to hinder and delay their creditors. Hence the rules that apply in cases of constructive fraud are not applicable to this case. Where the fraud is constructive only, the grantee comes into court with comparatively clean hands, and the courts treat him with leniency. In such cases the fraudulent conveyance has been allowed to stand as security for the purchase price, or for the amount of prior liens or debts of the grantor paid by the grantee, or for taxes paid. . . . Cases may be found, and they are doubtless well and equitably ruled, where a fraudulent grantee, when called upon to account for rents and profits, or for the value of the property received, has been allowed to reduce the recovery by the amount of liens against the property that he has paid and discharged. (*Loos v. Wilkinson*, 113 N. Y. 485. . . . *Bank v. Halsted*, 56 Hun 530, 9 N. Y. Supp. 852.) . . . Appellant Patterson relies much upon these cases, but this action is so different in its nature from these cases from New York that it is evident that the ruling in those cases cannot aid appellant. The evidence in this case shows that the gross value of the crops raised upon the land has been about $12,000 per year. If Patterson were required to account to the creditors of the grantors for this sum, he might then confidently rely upon the above cases.

"It is not the true province of a court of equity to punish a party for fraud. That is left to the courts of law. Neither will it despoil him of his property. But when it becomes necessary for a party to invoke the equity powers of the court to obtain relief from a position in which he has voluntarily

placed himself—when it becomes necessary for him to assume the position of actor, and appeal to equity for affirmative relief—then he must come with clean hands." (pp. 323, 324, 325, 326.)

The court then cites and quotes from *Roller Mills v. Ward*, supra, and kindred cases, and continues:

"We think these principles must be applied in this case in their full vigor. When the deeds from the Wards and Hall to Patterson were executed, there existed valid liens and incumbrances upon the property conveyed. It was not possible to defraud these secured creditors. Their rights in the property were clearly fixed. But the successful consummation of the scheme to defraud the unsecured creditors, and at the same time secure to the grantors the continual use of the land, and the benefit of the crops raised thereon, required that provision be made whereby the securities would not in the meantime be enforced against the land. Therefore Patterson assumed these incumbrances. . . . In pursuance of this agreement, Patterson has paid a portion of these secured claims, but all the payments so made by him were in aid of the original corrupt purpose of defrauding these plaintiffs. They constitute a part and parcel of the original fraudulent scheme, and inseparable therefrom. Therefore, when Patterson appeals to a court of equity to be indemnified for such payments, the relief cannot be granted without a violation of plain principles of equity jurisprudence. These principles must apply to the taxes also. Both parties knew that taxation was inevitable, and that the taxes must be paid in order to consummate their purposes. It appears that Patterson paid the taxes or a portion of them for one year. But this must be regarded as a voluntary payment by him, in aid of the original fraud." (p. 328.)

We note that in *Lovejoy v. Bailey*, 214 Mass. 134, a distinction was made in a case where a mortgage was paid off which discharged a lien on partnership property which had been transferred in fraud of a dormant partner. But the general principle under discussion in the present case was there recognized:

"As to the mortgage for $5,000 which was assigned to Clemson and foreclosed by him in the manner reported by the master, it is contended by the defendants that the amount thereof should be allowed to them in the accounting. So far as this claim rests upon any right of the defendants to be subrogated to the benefit of the incumbrance which they have paid by means of a foreclosure, their contention cannot be allowed. What they did was done in furtherance of their fraud as an essential part of their wrongful purpose. They acted in their own wrong; they do not come into court with clean hands, and cannot now invoke the equitable doctrine of subrogation to relieve them from the consequences of their tortious acts. *Railroad Co. v. Soutter*, 13 Wall. 517; *Sands v. Codwise*, 4 Johns. 536, 598; *Gillespie v. Moon*, 2 Johns. Ch. 585, 602; *Guckenheimer v. Angevine*, 81 N. Y. 394; *McCaskey v. Graff*, 23 Penn. St. 321; *Hays' Estate*, 159 Penn. St. 381; *Almond v. Wilson*, 75 Va. 613; *White v. Trotter*, 14 Sm. & M. 30; *Connecticut Mutual Life Ins. Co. v. Smith*, 117 Mo. 261, 297, 298; *Goble v. O'Connor*, 43 Neb. 49; *Johnson v. Moore*, 33 Kans. 90." (p. 155.)

The last case cited, *Johnson v. Moore,* supra, is perhaps the closest of our own decisions to the question here presented. Johnson loaned Moore and wife $745.92 to take up certain notes secured by a mortgage on the Moore homestead, held by Pryor Plank. Moore and wife executed a note and mortgage to Johnson in payment therefor. After the wife's execution of the mortgage, Johnson altered its terms so as to make it appear to stand as security for another and additional note for $117.45. It being held that the fraudulent alteration vitiated the mortgage, Johnson claimed rights of subrogation for the moneys paid by him to satisfy the earlier mortgage held by Pryor Plank. The court stated the question and answered it thus:

"Second, if the mortgage given to the plaintiff is held to be void, did he acquire a lien upon the homestead to the extent of the money advanced by him to pay off the prior mortgage debt upon the same property, and is he entitled to be subrogated to the rights of the prior mortgages and to a decree of foreclosure? . . .

"If the alteration of the mortgage had been accidentally or innocently made by plaintiff, he might have successfully applied for the application of the equitable doctrine of subrogation. It is well settled, however, that the doctrine of subrogation will not be applied to relieve a party from the consequences of his own unlawful act. . . .

"According to the unchallenged findings of the jury, the alteration of the mortgage by the plaintiff was not inadvertently made, nor was it done for the purpose of carrying out the intention and understanding of all the parties thereto, but was evidently made by plaintiff solely to advance his own interests at the expense of the defendants. He sought to extend the liability of the mortgagors beyond what they had agreed that it should be, and his action in making the alteration was not only a fraud upon the defendants, but under the statutes of Kansas constitutes a public offense. The application of the maxim, 'he that hath committed iniquity shall not have equity,' forbids the granting of the relief asked for by plaintiff." (pp. 96, 98, 99.)

Counsel for appellant argue that the present appeals come under the rules of equity announced in *Hofman v. Demple,* 52 Kan. 756, 35 Pac. 803; *New v. Smith,* 94 Kan. 6, 145 Pac. 880; and *Brooks v. Weik,* 114 Kan. 402, 219 Pac. 528. These cases have all been care-- fully examined. In *Hofman v. Demple,* the grantee of a deed which a wife had executed by duress and which was set aside was given subrogation for a mortgage paid off because the wife delayed so long in bringing her equitable action to set the deed aside that the grantee was misled into believing that she had acquiesced in the fraudulent conveyance. In *New v. Smith,* when the deed to Mrs. New's farm was set aside as fraudulent, the grantee, Smith, was

given subrogation for the amount of a mortgage which he had paid. But Smith had not been an actual participant in the fraud perpetrated on Mrs. New. He merely knew she had been defrauded. In *Brooks v. Weik*, it was very properly held that where Brooks was swindled out of his property by his own agents, getting in exchange therefor a lot of oil leases on Texas lands, which leases he intended to purvey to a gullible public at advanced prices by fraudulent devices, he was not precluded from equitable redress, since the fraud perpetrated on Brooks had no connection with any possible fraud he may have intended to perpetrate on others in the sale of the leases. In neither of these cases, we think, is there any support for the contention appellant seeks to maintain. By his own fraudulent conduct Andrew Dyatt has gotten himself into a situation where a court of equity must decline to help him. His action in reinstating and renewing the insurance company's mortgage, in making a payment on the old debt, in paying interest and taxes, were all part and parcel of the original fraudulent scheme and inseparably connected therewith. Without making these payments the original scheme of defrauding Leinbach could not have been consummated and the fruits of that fraud secured to himself; and the result is that the trial court properly left Andrew Dyatt in the predicament in which his wrongful intermeddling with Leinbach's affairs had placed him, and for which Leinbach was in no way responsible.

This conclusion renders it unnecessary to determine whether appellants' claims urged here were necessarily involved in the earlier chapter of this litigation and therefore barred under the general principles of *res judicata* by the judgment affirmed in 112 Kan. 782.

Both judgments are affirmed.

HARVEY, J., not sitting.